George W. SCHMIDT, Plaintiff,

v.

John J. CALLAHAN, Acting Commissioner of Social Security, Defendant.

No. 97 C 912.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 13, 1998.

Marcie E. Goldbloom, Frederick J. Daley, Frederick J. Daley, Ltd., Chicago, IL, for Plaintiff.

Kathryn Ann Kelly, U.S. Attorney's Office, Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

This is the plaintiff George W. Schmidt's second attempt in his long and unsuccessful quest to secure social security disability benefits in the federal courts. In his first appearance before this Court, Schmidt successfully obtained a remand. *Schmidt v. Shalala*, No. 94 c 5627, slip op. (N.D.Ill. Sept. 29, 1995) (*"Schmidt I"*). Schmidt seeks review of the defendant's final decision denying him disability insurance benefits pursuant to 42 U.S.C. § 405(g). In this action, Schmidt asks this Court to set aside the Commissioner's unfavorable disability determination and to award him attorney's fees. Alternatively, Schmidt requests a remand for further proceedings based upon the Administrative Law Judge's ("ALJ") errors. Schmidt's second appearance has not fared as well as his first because our review of the record indicates that we must affirm the ALJ's findings.

Currently before the Court are the parties' cross-motions for summary judgment. *See* Fed.R.Civ.P. 56. In his motion, Schmidt asserts that he is entitled to summary judgment or remand because: 1) the ALJ erred when he failed to reopen the determination of the first application; 2) the ALJ improperly relied upon interrogatory answers of a medical expert whom the claimant was not permitted to cross-examine; 3) the ALJ's determination that Schmidt was not credible was based upon objective criteria and was erroneous; and 4) the ALJ's reliance upon certain evidence and rejection of other evidence constitutes reversible error. Conversely, the Commissioner contends that summary judgment in favor of the defendant is appropriate because the decision to deny benefits is supported by substantial evidence and the ALJ did not otherwise commit reversible error.

## FACTUAL HISTORY

The following facts have been drawn from the Certified Copy of the Administrative Record ("R.") and this Court's unpublished opinion issued in *Schmidt I*. After graduating from college, Schmidt began working at Montgomery Ward as a store manager in 1954. In 1968, Schmidt joined the Singer Company as the marketing manager for North America. (R. 1177). When he left in 1972, he was vice president of Singer's operations in Europe, the U.S., and Canada. The DuPlan Corporation, a New York Stock Exchange textile company, then hired Schmidt as president and C.E.O to oversee the company's downsizing efforts. (R. 1178). Du-Plan fired him two years later, with three years remaining on his five-year contract. (R. 1178).

Schmidt returned to Montgomery Ward as a store manager in 1974. Schmidt acknowledged that his new position was something of a demotion, but he was apparently unconcerned with this reduction in stature, recalling that he "could do the work in my hip pocket." Schmidt was promoted to district manager, and then senior vice-president for Wards. (R. 165-169, 172). He stated that in his various positions, he established selling policies, and made real estate, financial, employment, and personnel decisions. (R. 173). In 1981, Schmidt retired from Wards at the age of 56, either because his employer strongly suggested such a course of action (R. 830, 834), or because of his poor health (R. 171), or some combination of these factors.[1]

In January 1982, Schmidt began working for a friend as a manager of a grocery and drugstore chain and continued to do so until he was dismissed in November of that same

---

1. In his reply brief, Schmidt contends that while he reported that Wards was anxious for him to retire, and then later indicated that poor health induced his early retirement, these statements do not necessarily contradict each other. Rather, according to Schmidt, any apparent inconsistencies could have been mere miscommunications and should have been reconciled by the ALJ.

year. (R. 240–41). While employed with the chain, Schmidt learned how to use a cash register, "a modern one." (R. 1200). Schmidt testified that he experienced "very severe angina pains and very severe fatigue" while employed at the grocery chain. (R. 242). However, he was able to lie down and take a nap in a room behind his office when he experienced such pain. (R. 242). Following his dismissal from the grocery chain, Schmidt worked as an independent business consultant until he suffered a transient cerebral ischemic attack ("TIA") and angina pectoris on March 28, 1986. (R. 176). On March 29, 1986, he stopped working altogether and has held no substantially gainful employment since that time. (R. 176).

On October 17, 1986,[2] Schmidt filed his first application for benefits under the Act, alleging disability with an onset date of March 28, 1996. After initial and reconsidered denials, Schmidt requested a hearing before an ALJ. The request was granted and Schmidt's hearing was held on October 8, 1987. ALJ John Mondi issued a decision denying Schmidt's application for benefits on January 29, 1988. (R. 221–28). The Appeals Council denied Schmidt's request for review on May 19, 1988 (R. 306–07). Schmidt appealed to the Federal District Court and then the Seventh Circuit Court of Appeals. Both courts upheld the ALJ's denial of benefits. *See Schmidt v. Sullivan,* 1989 WL 56986 (N.D.Ill. May 19, 1989); *Schmidt v. Sullivan,* 914 F.2d 117 (7th Cir.1990), *cert. denied,* 502 U.S. 901, 112 S.Ct. 278, 116 L.Ed.2d 230 (1991).

On December 7, 1989, Schmidt filed his second application for benefits, alleging the same onset date of March 28, 1986. (Schmidt I at 3,4). His new application, however, contained evidence of a psychological impairment, and additional documentation of his heart condition. His claim was denied initially and upon reconsideration, after physicians and disability examiners for the state agency determined that he was not disabled. *Id.* Schmidt then requested and received a second hearing, which was held before ALJ Arthur Adler on March 19, 1991. *Id.* ALJ Adler denied Schmidt's request for benefits on January 22, 1992. *Id.* The Appeals Coun-

cil, however, remanded the case on July 26, 1992, providing the ALJ with specific instructions for reviewing Schmidt's claim. *Id.*

On remand, a supplemental hearing was held before ALJ Irving Stillerman on April 20, 1993. In a pattern that must have been all too familiar to the claimant, ALJ Stillerman denied Schmidt's application for benefits in a decision dated October 14, 1993. *Id.* The Appeals Council then denied Schmidt's request for review, rendering ALJ Stillerman's ruling the final decision of the Commissioner. (R. 5–6). Undeterred, Schmidt appealed the determination to this Court for review. Schmidt claimed that ALJ Stillerman erred in refusing to reopen the case in light of "new and material evidence" and that ALJ Stillerman's disability determination was not based upon substantial evidence.

This Court rejected Schmidt's contention that ALJ Stillerman erred in refusing to reopen his case, finding that Schmidt failed to sustain his burden of demonstrating an error of law "so clear and arbitrary as to amount to an abuse of discretion." *Schmidt I* at 26–27 (quoting *Butterick Co. v. Will,* 316 F.2d 111, 113 (7th Cir .1963)). However, we remanded the action due to ALJ Stillerman's failure to consider Schmidt's entire medical history. Specifically, this Court found that ALJ Stillerman's opinion did not adequately address the psychological and emotional components of Schmidt's condition, and did not properly reference Schmidt's angina pain in the assessment. In addition, we directed the ALJ on remand to determine whether the newly tendered evidence was in fact "new and material" so as to justify not affording the previous rulings denying benefits res judicata effect.

Following remand, a hearing was held before ALJ Edward L. Kohler on May 2, 1996. At the hearing, Vocational Expert ("VE") Sally Hart testified that the plaintiff was capable of performing a number of low-stress jobs readily available in the local economy. VE Hart explained that the plaintiff could transfer skills acquired in his previous positions to the jobs of cashier, payroll clerk, billing clerk, accounting clerk, appointment clerk, or information clerk. Schmidt inter-

---

**2.** This application had a protective filing date of September 29, 1986.

jected that he did not have direct experience with record keeping, accounting, payroll, etc. (R. 1243–44). Schmidt explained that he went right into management, and that he looked only "at the bottom number.... Somebody puts those together, I look at the bottom line.... I look at how factories are going. I deal with labor negotiations. I don't do payroll." (R. 1244).

On cross-examination, VE Hart acknowledged that Schmidt could not do any of these jobs if he experienced back pain after 20 to 40 minutes, which would require 5 to 15 minutes of stretching to alleviate. (R. 1238–39). VE Hart agreed that if Schmidt was able to concentrate for only 30 to 45 minutes, requiring a 5 to 10 minute break to regroup, he was not qualified for these positions (R. 1239–40). Specifically, VE Hart stated that if Schmidt had a limited ability to maintain attention and concentrate, whether caused by fatigue, or a mental or psychological impairment, such a condition "would preclude any employment." (R. 1228–29).

The ALJ then heard the testimony of James Miller, a Certified Rehabilitation Counselor. Miller attempted to rebut VE Hart's testimony by explaining that all of the jobs VE Hart listed were in the Clerical and Kindred industry, not the Retail industry. Because Schmidt's experience was within the Retail industry, Miller reasoned that Schmidt's job skills were irrelevant to the jobs listed by VE Hart. (R. 1128). Miller conceded, however, that jobs within the retail industry carried varying levels of stress.

On November 23, 1996, ALJ Kohler issued his opinion. ALJ Kohler noted that Schmidt had acquired enough credits to receive insurance until December 21, 1989. After reviewing the evidence, ALJ Kohler concluded that giving the original benefits determination res judicata effect was unwarranted. However, ALJ Kohler found that, based upon the first application dated September 29, 1986, none of Schmidt's impairments or a combination thereof constituted a disability. Kohler stated that he believed Schmidt exaggerated his alleged symptoms, and therefore discounted certain conclusions reached by his examining physicians. Ultimately, Kohler determined that while Schmidt was unable to return to his previous employment, he could perform a number of jobs that existed in the marketplace.

On January 7, 1997, the Appeals Council stated that the ALJ's decision would become the Commissioner's final administrative decision. (R. 808). Schmidt filed a timely Complaint for Judicial Review of the Commissioner's final decision February 10, 1997.

### Medical History

The medical records presented to ALJ Kohler were extensive and included the following medical data and diagnostic results.

### Hospital Records from Northwestern Memorial Hospital, Dr. Lee F. Rogers, dated 12–20–84.

Dr. Rogers interpreted the Diagnostic Radiology Report and determined that

> Two views of the chest show the heart to be of normal size. There was a tortuous ascending and descending aorta. The pulmonary vascularity is normal. The lung fields are free of infiltrate and effusion. There is a granuloma seen in the right mid lung field. There is an area of what appears to be pleural thickening at the lateral portion of the right mid chest wall around the fourth rib. (R. 407).

### Office and Hospital Records of Dr. Martin Brandfonbrener, Schmidt's cardiologist from 9–17–84 to present.

According to Dr. Brandfonbrener's testimony, "[i]n 1984, [Schmidt] had occasional central substernal pain associated with left arm soreness; this occurred playing handball, requiring him to slow down." (R. 793) Upon examination, Dr. Brandfonbrener determined that Schmidt suffered from hypertension, coronary atherosclerosis, and possible peripheral arteriosclerosis. (R. 498–99). On August 27, 1984, plaintiff underwent a stress test that showed

> He had achieved a pulse rate of 160, at which point he developed shoulder pain and fatigue and the stress test was terminated due to those symptoms. He has some isolated atrial premature beats. The electrocardiogram was read as consistent with ischemia despite functional capacity being above average. The blood pressure response, however, was excessive rise in

blood pressure [sic] during exercise. At the termination of the exercise, his blood pressure was 20 over 120 millimeters of mercury. It was thought at that time, that the combination of his high blood pressure and coronary problems led to angina with electrocardiographic confirmation. (R. 793–94).

On December 21, 1984, plaintiff underwent a coronary arteriogram which found the left coronary artery to be normal and the right coronary artery to have "three sequential 30% obstructions." (R. 794). In addition, the arteriogram led Dr. Brandfonbrener to conclude that

> The proximal left anterior descending coronary artery had less than 30% but the mid-segment had 50–60% and the lesion was quite long. Toward the distal end of the plaque, the narrowing in the left anterior descending artery was 60% and the disease involved a narrowing of the second diagonal artery. The circumflex coronary artery had a 30% obstruction and the left ventricular angiography showed a suggestion of left ventricular hypertrophy. (R. 794).

At this time plaintiff was treated with antianginals and blood pressure medication.

In September of 1986, plaintiff underwent a cerebral angiogram "showing the right carotid occlusion of about 80%. (R. 794). At this time, plaintiff was complaining of angina, mostly at rest, occurring twice a week." (R. 794). The physical examination indicated plaintiff had developed a "fourth heart sound as well as a Grade 1 systolic apical murmur" as well as a blood pressure level of 160 over 100. (R. 794). The doctor placed Schmidt on blood thinner, Cardizem, and Persantine to treat his condition. On September 19, 1986, plaintiff had a thallium stress test in which

> Patient achieved 84% of his maximum predicted heart rate. Stress images reveal a questionable area of decreased apical perfusion noted only on the anterior view. Redistribution images reveal a similar pattern of distribution of perfusion, with again a question of slight improvement in this apical region. Compared with the previous study dated 8/27/84, there has been no significant interval change. IMPRESSION: Thallium myocardial perfusion

study without definite evidence of exercise-induced ischemia. (R. 554).

In reviewing the results of this stress test, Dr. Brandfonbrener noted that plaintiff's functional capacity "has remained above average due to his long history of high level physical activity in which he engaged prior to developing his illness." (R. 795).

Dr. Brandfonbrener said, though documentation of the actual test is absent in the record, that plaintiff had a repeat Thallium treadmill test on July 30, 1987, which showed plaintiff as suffering from

> A clear lack of blood supply, or ischemia, and there was a resting hypertension of 162 over 108 before the exercise started which rose to a maximum systolic of 206 and a maximum diastolic of 116. Thallium showed apical defect with definite redistribution meaning an apical infarct or apical thinning. (R. 795–96).

In August of 1987, plaintiff saw Dr. Brandfonbrener due to complaints of chest tightness, occurring several times a week, usually at the start of exercise and similar to his prior chest pain. (R. 594, 795). At this visit, the doctor recorded that plaintiff suffered from central substernal discomfort, lasting five to six minutes, when discussing an ill family member. (R. 594, 795). Schmidt's blood pressure was elevated to 140 over 96; there was irregular heart rhythm, and there was an "S4 and a grade One-half over six systolic murmur." (R. 594, 795).

When Dr. Brandfonbrener saw Schmidt on February 16, 1988, one day after plaintiff had lost consciousness after playing handball and was taken to the Holy Family Hospital Emergency Room, (R. 566), Schmidt's blood pressure was 138 over 86; he had a "fourth heart sound, regular rhythm and a Grade 1 systolic apical murmur." (R. 796). In March of 1988, plaintiff complained of having "trouble organizing his thoughts and financial affairs which produced a sensation of high blood pressure." (R. 796). His blood pressure was 108 over 66 and the physical examination "revealed some edema; there was regular rhythm and the lungs were clear." (R. 796).

In December of 1988, the angina attacks were down to twice a week and his blood pressure measured 140 over 96. (R. 796). In addition, "[t]here was a Grade 1 systolic murmur and regular sinus rhythm." (R. 796). On January 5, 1989, Schmidt underwent another stress test that resulted in fatigue at stage four of the test and chest discomfort and fatigue at the end of the test. (R. 409). The interpretation of the test stated "ECG changes are present, but are not diagnostic of ischemia." (R. 410). Plaintiff's functional capacity and blood pressure response to exercise were both viewed as "normal," and the administering physician commented "[s]ince test of 7/87, there is much less ST depression observed. However, the patient had less heart rate response to a similar level of stress." (R. 410).

In March of 1989, Schmidt reported less frequent angina, but worse pain, mostly at rest. (R. 589, 797). Plaintiff claimed to continue to playing handball, but at a less vigorous pace, with marked episodes of fatigue. (589, 797). His physical examination showed his blood pressure "well controlled" at 106 over 76. (R. 589, 797). While plaintiff complained of dizziness, disorientation and slight lightheadedness at times in June of 1989, his blood pressure remained controlled at 112 over 78. (R. 588, 797). In November of 1989, plaintiff was seen two times due to an increase in the frequency of his angina and complaints of "shortness of breath on attempting handball, the inability to walk fast, some nighttime cough, some mild edema and lightheadedness with some disorientation." (R. 586–87, 797). Schmidt's blood pressure was 142 over 94, rhythm was regular, the lungs were clear, and there were no murmurs or extra heart sounds. (R. 586, 797). This time, however, plaintiff complained of chest pains "on effort" rather than at rest; therefore, Dr. Brandfonbrener scheduled another thallium stress test. (R. 586, 797). The results of the stress test were as follows:

The patient achieved 86% of maximum predicted heart rate. Compared to the prior study of 1–5–89, there is again noted a subtle, predominantly fixed defect involving the inferolateral region. On the current examination, there is also a suggestion of mild reversible ischemia in the low anteroseptal and apical region, somewhat better visualized on the planar images. There is abnormal wash-out in this region, representing interval change compared to the prior examination. (R. 427).

On February 14, 1990, Dr. Brandfonbrener noted that Schmidt's symptoms had changed. (R. 585, 797). "The tightness in his chest would last for one to two hours, and involve the entire front portion of the chest bilaterally. It was less on effort and more on worry and frustration." (R. 797). On March 4, 1990, Dr. Brandfonbrener recorded in the patient progress notes that "[s]tress sets him [Schmidt] offTIAs X2." (R. 584). Due to the change in symptoms, Schmidt underwent a repeat heart catherization on March 8, 1990. (R. 454–59, 797). The results of that test were as follows:

The right coronary artery had three successive lesions as previously noted, of 30% or less, and the acute marginal branch had at its origin 70% blockage. The proximal left anterior descending had 30% narrowing and, in the mid segment, along lesion with calcification was estimated to be 50%. The second diagonal had 30–35% narrowing and the circumflex had proximal 30% narrowing as well as first obtuse marginal branch showing 30% narrowing. There was possible left ventricular hypertrophy and a decrease in left ventricular compliance. (R. 797).

Dr. Brandfonbrener again examined Schmidt in May of 1990. (R. 583). While the doctor's progress notes from that examination begin with the statement that Schmidt "Feels Better," (R. 583), he also recalls that plaintiff was having some questionable left parasternal discomfort, (R. 798). At this appointment, plaintiff's blood pressure was elevated to 150 over 100 with "regular rhythm and a fourth heart sound was again heard." (R. 798).

In a *Cardiac Report* submitted to the Bureau of Disability Determination Services on May 17, 1990, Dr. Brandfonbrener stated that plaintiff suffered from chest pains "on emotional stress and physical activity," (R. 425), and that the precipitating factor to his chest tightness was "emotional upset" and "handball." (R. 426).

*Letter from Dr. Pierre Abi–Mansour, Assistant to Dr. Andreas R. Gruentzig, Professor of Medicine (Cardiology) and Radiology, dated 2–19–85.*

On February 11, 1985, Dr. Brandfonbrener wrote Dr. Gruentzig to receive information on whether Schmidt would be a good candidate for balloon angioplasty. After reviewing plaintiff's angiogram and the information provided to him in the original inquiry, Dr. Pierre Abi–Mansour, Dr. Gruentzig's assistant, responded to Dr. Brandfonbrener. In that response, Dr. Pierre Abi–Mansour stated,

> The clinical picture with chest pain occurring at rest and with moderate exertion is not commensurate with the severity of the stenosis on arteriography. This is suggestive of mixed angina with spasm superimposed on a fixed lesion. We would be glad to perform angioplasty on Mr. Schmidt if ischemia could be documented on thallium stress testing in the distribution of the LAD. (R. 552).

Since plaintiff's subsequent thallium stress tests did not conclusively illustrate ischemia, the angioplasty was never performed.

*Office Records and Statements of Dr. Charles F. Nadler, Schmidt's Family Physician since 1976.*

According to Schmidt's testimony, Dr. Charles Nadler has been his internist since his hospitalization in 1976. (R. 254). On September 11, 1987, Dr. Nadler filled out the Social Security Administration's *Medical Report,* which presented the plaintiff's physical capacity. (R. 496). In that form, Dr. Nadler indicated that Schmidt could sit for six hours, stand for one hour, and walk for one hour in an eight-hour workday. (R. 496). In addition, the doctor noted that plaintiff could occasionally lift 20–25 lbs. and occasionally carry 11–20 lbs. (R. 496). While Schmidt is unable to use either hand for repetitive action such as "pushing and pulling of arm controls," he is able to perform "simple grasping" and "fine manipulation" with both his right and left hands. (R. 496). Plaintiff is able to bend and reach "frequently," squat and crawl "occasionally," but cannot climb "at all." (R. 496). When asked to provide remarks on the above or other functional limitations, Dr. Nadler wrote, "[p]atient has angina pectoris at rest and with mod. [moderate] exercise. Has not tolerated stressful situations which precipitate angina." (R. 496).

Dr. Nadler also filled out the Bureau of Disability Determination Services' *Medical Questionnaire* on February 13, 1990, having last examined plaintiff on 11–16–89. (R. 449). Within that questionnaire, Dr. Nadler stated that Schmidt has suffered from angina pectoris with symptoms of "chest pain with exertion" since 1987. (R. 449). When asked whether there were "any other mental or physical conditions not discussed ... which would significantly affect [Schmidt's] ability to work," Dr. Nadler wrote, "anxiety reaction with executive duties exacerbate angina ∴ [therefore] unable to work at usual an[d] customary employment." (R. 449). In addition, the doctor recorded that plaintiff's gait and ambulation were "normal." (R. 451, 453).

*Electromyogram Report by Dr. Emanuel Semerad, Neurologist, dated 8–25–89.*

It is unclear from the record if the visit to Dr. Kenneth Vatz's office, and treatment by Dr. Semerad, which led to the *Electromyogram Report,* was simply a one-time event or if Schmidt had been treated there on a regular basis. Nevertheless, Dr. Semerad's diagnosis on August 25, 1989, indicates that plaintiff suffers from

> Minimal bilateral carpal tunnel syndrome, greater on the left. This is probably an incidental finding with regard to the patient's current symptomatology. On directed clinical examination, no definite abnormalities of strength, reflexes or sensation could be found. However, with foraminal compression on the left, the patient did experience pain in the shoulder and arm in about the same distribution as he has been having the pain, and he also experienced some paresthesia along the lateral aspect of the left forearm. He had good shoulder range of motion. Adson's maneuver was negative. There was a positive Tinel's sign over both wrists. (R. 576–77).

***Psychiatric Evaluation by Ana A. Gil, M.D., dated 6–20–90.***

On June 20, 1990, Dr. Gil performed a fifty minute psychiatric evaluation of the plaintiff in connection with his claim for Social Security Disability Benefits. (R. 464–68). In reviewing Schmidt's family psychiatric history, Dr. Gil noted that "[t]here is no history of psychiatric hospitalizations, treatment, alcohol or drug abuse, suicide attempts or gestures." (R. 465). After presenting the background information in her report, Dr. Gil performed a *Mental Status Evaluation* and provided an Assessment of the plaintiff's condition which stated as follows:

> On mental status exam, the claimant appeared depressed. He also showed cognitive impairment such as paucity of thought, tangentiality, circumstantiality, perseverative speech and reports a history of memory problems. These signs and symptoms are probably secondary to some cognitive impairment due to his transient ischemic attacks. The claimant's judgement [sic] and ability to do calculations are intact. There is no evidence of psychosis on mental status exam. (R. 467).

Dr. Gil's diagnosis of Schmidt's condition was " 1) Cognitive impairment secondary to TIA's; 2) Major depression with anxious features, single episode." (R. 468).

***Illinois Department of Rehabilitation Services, Bureau of Disability Determination Services, Vocational Assessment by Jim Anderson, Vocational Assessment Specialist, dated 7–19–90.***

Mr. Anderson states that Schmidt, in accordance with the Physical Capacities Assessment of 5–23–90, "can perform an essentially full range of medium work activity, both currently and as of the date last insured." (R. 470). However, the Specialist then qualifies this determination based on the Mental Capacities Assessment to state that "this claimant can be expected to perform only simple, unskilled work functions which would not require sustained, appropriate interaction with the general public or close supervision." (R. 470). The restriction, Mr. Anderson states, "applies only to the current time. An assessment of the claimant's psychiatric condition as of his date last insured, dated 07/18/90, indicates that there is not sufficient medical evidence to determine the existence of a significant mental restriction as of the date last insured." Mr. Anderson agrees that the mental restriction would "currently" prevent Schmidt from performing his past, relevant work. (R. 470).

The Vocational Specialist concluded that even with the mental restriction, plaintiff would not be considered disabled as of 7–18–90, when the assessment was made. In fact, Mr. Anderson felt that Schmidt could be a "Bakery Worker (bakery products) 929.686–010; Kitchen Helper (hotel and restaurant) 318.687–010; and Laundry Laborer (laundry) 361.687–018." (R. 470). Additionally, Mr. Anderson stated specifically the incidence of those jobs in our national economy based on the U.S. Bureau of Census statistics from 1987. (R. 470).

***Interrogatory by Dr. Leonard Sommer, undated; Letter by Dr. Sommer, dated April 29, 1993.***

Dr. Sommer is a Professor of Medicine (Cardiology) at the University of Miami School of Medicine, Florida. (R. 479). He was selected from a panel of Medical Advisors maintained by the Social Security Administration and was paid by them for his opinion. (R. 480). When asked whether "any of the claimant's impairments present medical findings that are at least equal in severity and duration to a listed impairment in Appendix 1," Dr. Sommer responded "No." (R. 482). In addition, the doctor found that there were no, as tolerated, specific functional exertional or nonexertional restrictions imposed on Schmidt due to his illness. (R. 483). In fact, Dr. Sommer stated that there is no objective basis for claimant's complaints of "stress, angina attacks from emotional concerns, depressed, cannot cope, headaches, mental-confusion." (R. 483).

On April 29, 1993, Dr. Sommer responded to a request by plaintiff's counsel to review some reports (submitted by plaintiff's counsel) and evaluate Schmidt's disability. (R. 791). After reviewing counsel's letter and enclosed reports, Dr. Sommer wrote

> I am impressed more with the functional and possibly psychiatric aspects than with the degree of structural cardiac disease, primarily because of the continued excel-

lent effort tolerance which, although associated with subjective discomfort suggesting angina, has consistently demonstrated marginal or, at most, mild evidence for myocardial ischaemia [sic] in the objective parameters of electrocardiographic and nuclear studies. (R. 791).

### Vocational Expert Testimony by Dr. John M. Williams before ALJ Arthur Adler.

Dr. Williams was retained as an expert witness by Schmidt to determine whether his skills were "transferable," considering all relevant factors such as physical and alleged mental illness, age, and past work experience. (R. 715–28). Dr. Williams testified that Schmidt "essentially has a one-industry background" in the retail trade, which has been considered to require a light exertional level in recent editions of the *Dictionary of Occupational Titles*. (R. 716). The expert testified that plaintiff's skills included "the ability to analyze numerical and alphabetic data, to be able to understand the processes and procedures related to management, to control, to coordinate. . . . to understand the financial records related to the retail industry . . . to hire and fire . . . to deal with the public specifically in problem solving." (R. 722). However, Dr. Williams noted that these skills were "ideographic to the retail sales industry" and could be transferred only to other jobs in that particular industry. (R. 722). He went on to testify that there were no retail industry jobs with little stress which Schmidt could transfer his skills. (R. 723). When the ALJ questioned the validity of such a response, Dr. Williams conceded that there were retail industry jobs with varying degrees of stress. (R. 724).

In reference to the Medical–Vocational Guidelines, 20 C.F.R. Part 404, Subpt. P, Appendix 2 (the "Grid"), Dr. Williams testified that a person of advanced age with a high school education or more who has acquired skills as a result of his past work is considered disabled if those skills are "not transferable." (R. 728); *See* Rule 201.06, Table No. 1 of Appendix 2, 20 C.F.R. Part 404, Subpt. P. Dr. Williams stated that people of this age "do not make adequate adjustments to the downward mobility associated with doing unskilled work after they have a long work history of doing semi-skilled and skilled work." (R. 728). In recognition of the limitations due to Schmidt's vulnerability to stress, Dr. Williams concluded:

> There's no work that I could suggest for that person that that person could, in fact, do that exists in the regional or national economy and my further point is to put a person like this into unskilled work activity would be very much more stressful for someone with his work history and background because of the demeaning nature of the work and the boredom associated with it. (R. 736).

### Holy Cross Hospital Records, Ft. Lauderdale, FL, dated 8–26–92 through 8–27–92.

On August 26, 1992, after playing handball, drinking lots of water, and having two margaritas, Schmidt suffered a cardiopulmonary arrest while visiting a friend at Holy Cross Hospital in Ft. Lauderdale, Florida. (R. 689). He remained in the hospital overnight under the observation of Dr. Martin Shansky and was discharged the following day by wheelchair. (R. 697).

### Letter from Dr. William Reich, Psychotherapist, dated 11–2–92.

Dr. Reich performed extensive psychological testing on Schmidt and saw him in individual psychotherapy from 10–24–87 through 3–10–88. (R. 711). In a letter submitted to plaintiff's counsel, at his request, Dr. Reich discussed his medical report dated 10–23–87 (which was not a part of the 1994 Administrative Record) in relation to Dr. Gil's psychiatric report. Within the letter, Dr. Reich stated that "[a]lthough there was no significant clinical depression present during the period of time during which I had regular contact with Mr. Schmidt, I am not at all surprised that Dr. Gil observed it in him." (R. 711). In addition, Dr. Reich gave an example of Schmidt's compulsive need to control in which plaintiff, on August 17, 1991, pressured his lady friend into allowing him to accompany her to one of the sessions and "began attempting to control the situation, becoming more and more agitated and angry as he realized he could not dominate the meeting." (R. 712).

*Response to Interrogatories from Frank Mendrick dated 5-8-93.*

Dr. Mendrick indicated that Schmidt had transferable analytical, clerical, and numerical skills that were highly marketable to personnel work, cashier and whole direct sales work, and bank teller work. Mendrick stated that the transferable skills would be equally applicable in either the retail or bank teller fields. In response to an interrogatory describing a hypothetical person with claimant's physical characteristics and arguably some of claimant's mental characteristics— specifically, a person with marked limitations in performing at a consistent pace, accepting criticism or instruction, and maintaining concentration and attention— Dr. Mendrick stated that such a person would not be able to perform his past work, any other work, light exertional work, or medium exertional work. (R. 779). The reasoning given by Dr. Mendrick is a follows:

> Any substantial loss of ability (marked limitation) to perform the basic work activities of competitive employment, such as completing the workday and workweek, performing at a consistent pace within normal rest periods, responding appropriately to the supervisor, would severely limit the individual's ability to perform any work as it is normally performed in the economy. (R. 779).

## DISCUSSION

Plaintiff makes several arguments for relief in the instant action. First, plaintiff asserts that ALJ Kohler erred when he avoided his delegated authority under 20 C.F.R. § 404.988 (1996) to reopen the disability determination on the first application. Next, Schmidt contends that ALJ Kohler improperly found that his due process rights were not violated when ALJ Adler admitted an interrogatory by a nonexamining physician without allowing Schmidt the opportunity to cross-examine him. Schmidt further asserts that the ALJ's assessment of his credibility was erroneous. Finally, Schmidt argues that ALJ Kohler's disability determination is not supported by substantial evidence. Specifically, Schmidt contends that ALJ Kohler did not give "good reasons" for discounting the opinions of treating doctors, failed to give proper weight to certain testimony, and relied too heavily upon other testimony. We will address each argument in turn.

## I. THE ALJ CONSTRUCTIVELY RE-OPENED SCHMIDT'S CASE

The plaintiff begins by arguing that ALJ Kohler "de facto reopened" Schmidt's initial, 1986 application for benefits. In support of this proposition, Schmidt argues that the ALJ acknowledged that there was new and material evidence in the record, found that the doctrine of res judicata was not applicable to such evidence, made findings going back to the original onset date of March 28, 1986, and stated that the decision was based upon the Schmidt's first application. Therefore, Schmidt contends, the ALJ's ruling indicating that he would not reopen the case was erroneous.

■ In response, the defendant contends that ALJ Kohler could not have constructively reopened Schmidt's case because ALJ Kohler's determination was made almost ten years after the initial determination on Schmidt's first application. The regulatory provisions limit reopening on the basis of good cause, including the presence of new and material evidence, to the period of four years from the date of the initial determination. 20 C.F.R. §§ 404.988(b), 404.989 (1996). We acknowledge the veracity of this proposition, but find the defendant's attempt to apply it misses the mark. The defendant incorrectly relies upon the date ALJ Kohler *reviewed* Schmidt's application in computing the four year period, as opposed to the date Schmidt *filed* his second application. However, in computing the four year period, it is the date that the applicant files his application that matters. *See Hennings v. Heckler,* 601 F.Supp. 919, 925 (N.D.Ill.1985). The defendant denied Schmidt's initial application on December 29, 1986, and Schmidt filed his second application on December 7, 1989— well within the four year window envisioned by the regulations. Accordingly, we address the plaintiff's contention that ALJ Kohler constructively reopened his claim without the benefit of substantive argument from the defendant.

In determining whether ALJ Kohler constructively reopened Schmidt's initial claim for benefits, we note that generally, federal courts lack jurisdiction to review an ALJ's decision not to reopen a prior claim for benefits. *See Califano v. Sanders,* 430 U.S. 99, 107–09, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). Several courts have recognized an exception to this rule, however, where the Secretary has proceeded to review the merits of a claim otherwise barred by the doctrine of res judicata. *See McGowen,* 666 F.2d at 65–66. If an ALJ engages in such a review, there has been a constructive or de facto reopening and we have jurisdiction to review the claim. *Kasey v. Sullivan,* 3 F.3d 75, 79 (4th Cir.1993).

Here, ALJ Kohler determined that new and material evidence justified *not* applying the doctrine of res judicata based on the initial benefits determination. However, ALJ Kohler noted that there is a distinction between res judicata and administrative finality, citing SSR68–12a (C.E.1986).[3] SSR68–12a announced that while the application of res judicata might be inappropriate because of the existence of new and material evidence, the doctrine of administrative finality, which bars a litigant from seeking review of an administrative decision after the statutory deadline for appeal has lapsed, might still prevent an ALJ from reopening a claim. However, this ruling made explicit that administrative finality applied because the claimant's subsequent application was *not filed* within the four-year time frame. Accordingly, administrative finality is not a bar to reopening Schmidt's initial claim because Schmidt did file his claim within four years of his initial determination.

In the instant case, ALJ Kohler went on to review the merits of Schmidt's claim that would otherwise have been barred by res judicata because he found that Schmidt had submitted new and material evidence regarding his alleged psychological impairments

and additional medical evidence of his heart condition. The ALJ then proceeded to review all of the evidence and testimony relating back to the onset date announced in the first application, ultimately denying the claim because Schmidt failed to demonstrate that he was unemployable. The regulations direct the ALJ to reopen prior claims for "good cause," such as new and material evidence, and ALJ Kohler explicitly found that new and material evidence existed. 20 C.F.R. § 404.988(b) (1992). Because it is apparent that ALJ Kohler found that all of the prerequisites for reopening existed, and then proceeded to engage in a review on the merits of all of the evidence, we find that ALJ Kohler constructively reopened Schmidt's initial application.[4]

## II. ALJ KOHLER'S ADMISSION OF DR. SOMMER'S INTERROGATORY DID NOT CONSTITUTE A DUE PROCESS VIOLATION.

Just prior to his March 19, 1991 hearing, ALJ Adler informed Schmidt that the opinion of Dr. Leonard Sommer would be admitted into evidence. ALJ Adler failed to give Schmidt notice that this witness would be contacted, that interrogatories were prepared, or that Dr. Sommer had responded prior to the hearing. While Schmidt objected to the admission of the interrogatory on due process grounds, ALJ Adler denied the objection and admitted the answer into evidence. However, ALJ Adler did not rely upon this evidence in rendering his ruling. After the Appeals Council remanded Schmidt's case to ALJ Stillerman, Schmidt objected again to the admission of Dr. Sommer's interrogatories. In 1993, ALJ Stillerman allowed the evidence after Schmidt admitted that he had failed to send Dr. Sommer his own interrogatories.

Following ALJ Stillerman's adverse determination, Schmidt's counsel finally contacted

---

3. The doctrine of administrative finality generally bars a litigant from seeking review of administrative rulemaking after the statutory deadline for appeal has lapsed. *California et al. v. Federal Communications Commission,* 905 F.2d 1217, 1245 (9th Cir.1990). "Under res judicata, a final judgment on the merits ordinarily bars further claims by the parties based upon the same cause of action." *Id.*

4. We do not reach such a conclusion lightly, particularly since the claimant has already appealed the initial determination to the Appeals Council, the Federal District Court for the Northern District of Illinois, and the Seventh Circuit Court of Appeal's—without success. Schmidt even filed a petition for certiorari with the United States Supreme Court, which was denied.

Dr. Sommer and Dr. Sommer responded by addressing Schmidt's concerns in writing. We note that there is no evidence in the record that Schmidt ever requested to subpoena Dr. Sommer for cross-examination. *See* 20 C.F.R. §§ 404.916(b)(1), 404.950(d) (1996). Schmidt appealed ALJ Stillerman's determination to this Court in 1995, and there is no indication that Schmidt raised a constitutional challenge to this evidence.

Schmidt objected to the admission of the interrogatory on the basis of due process prior to his hearing before ALJ Kohler—almost five years after Schmidt received the interrogatories. Once again, Schmidt failed to request a subpoena to compel Dr. Sommer's testimony. ALJ Kohler allowed the evidence to remain, finding that the evidence was included as a part of the record when Schmidt appeared before this Court and that Dr. Sommer's written response to Schmidt's questions alleviated any due process concerns. Schmidt contends that the Seventh Circuit's decision in *Lonzollo v. Weinberger*, 534 F.2d 712 (7th Cir.1976), compels reversal. We disagree.

In *Lonzollo*, the Appeals Council, upon its own motion, reviewed an ALJ's determination awarding the plaintiff benefits. *Lonzollo v. Weinberger*, 534 F.2d 712 (7th Cir. 1976). The Council invited the plaintiff to submit additional evidence and to attend the hearing in Arlington, Virginia, even though the claimant resided in Chicago.[5] The Council requested that the plaintiff submit to an additional medical examination, and plaintiff complied. 534 F.2d at 713–14. The Appeals Council forwarded the new medical report, and plaintiff was given the opportunity to review it and submit his comments in writing. Shortly thereafter, the Council reversed the ALJ's finding of disability.

The Seventh Circuit held that while oral argument before the Appeals Council is not a matter of right, the fact that the Council engaged in additional fact-finding and held the hearing in another State deprived the plaintiff of his right to a hearing. *Lonzollo*, 534 F.2d at 714. The court rejected the Council's argument that furnishing plaintiff the report and allowing comment was sufficient to protect plaintiff's rights, finding instead that the plaintiff had the right to subpoena and cross-examine the physician concerning the report.[6] *Id.* The court further determined that "[w]here the written report is received after the hearing, we could not find waiver of the right to subpoena and cross-examine and to rebut unless the waiver is clearly expressed or *strongly implied from the circumstances.*" *Id.*

Unlike the court *Lonzollo*, we find that Schmidt's waiver of his right to subpoena and cross-examine Dr. Sommer can be "strongly implied from the circumstances." Schmidt was presented with Dr. Sommer's conclusions in 1991. Since that time Schmidt has had the opportunity to review the interrogatories and submit his own questions to Dr. Sommer. Moreover, Schmidt has had two additional hearings, and received review by both the Appeals Council and this Court. Yet during the almost five years between the hearing before ALJ Adler and the hearing before ALJ Kohler, Schmidt never once requested a subpoena. We cannot conceive of, nor has Schmidt offered, any reasonable excuse for failing to do so.[7] Were we reviewing

---

5. The Seventh Circuit seemed impressed by the fact that the Council could have readily arranged for an ALJ to preside over a new hearing in Chicago, and therefore given the plaintiff the opportunity to be present and to cross-examine the physician. The court noted that plaintiff's limited resources made it virtually impossible for him to attend the hearing. *Lonzollo*, 534 F.2d at 714.

6. While the Seventh Circuit's 1976 opinion in *Lonzollo* indicates that a claimant has the right to subpoena, the HALLEX provides that the ALJ is required to issue a subpoena only "if the claimant shows that an individual has evidence or can offer testimony that the claimant cannot

obtain without the subpoena, the ALJ determines that the evidence or testimony is reasonably necessary for the full presentation of the case, and the claimant has exhausted other means of obtaining this evidence or testimony." HALLEX 1–2–578(B).

7. Moreover, the record makes clear that Schmidt frequently traveled between Chicago and Florida—even residing in Chicago for a period of time between the issuance of ALJ Adler's opinion and the hearing before ALJ Kohler—and could have requested an examination of Dr. Sommer before an ALJ in Chicago, thereby eliminating any costs associated with flying Dr. Sommer to Florida for a hearing.

ALJ Adler's opinion, we might agree that Schmidt was not afforded an opportunity to adequately address the evidence adduced at his hearing. However, Schmidt clearly had ample opportunity to adequately prepare for both the admittance and substance of Dr. Sommer's testimony prior to his 1996 hearing. We find that ALJ Kohler's admittance of Dr. Sommer's interrogatory did not result in surprise nor prejudice to Schmidt, nor did it constitutionally deprive Schmidt of his rights. Rather, we find that Schmidt has waived his right to challenge the admission of the evidence in this case.

## III. CREDIBILITY

■ Schmidt contends that the ALJ improperly assessed his credibility. Schmidt asserts that because the ALJ's credibility determination was based upon *objective* factors—specifically, upon alleged discrepancies between statements Schmidt gave to his doctors and those given to the defendant—the "patently wrong" standard usually employed when reviewing such determinations should not apply. *See generally Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir.1994) (finding that reviewing courts must uphold administrative determinations of credibility based upon *subjective* factors such as demeanor unless those determinations are patently wrong). To the contrary, Schmidt argues, reviewing courts have "greater freedom" to review credibility findings based upon factors which are "just as easily assessed on a cold record as in a warm courtroom." *Thomas v. Sullivan*, 801 F.Supp. 65, 70 (N.D.Ill.1992). "Hence when objective inconsistency or fundamental implausibility is at issue, the ALJ has no special advantage over a reviewing court in determining credibility." *Id.*

We acknowledge that the Seventh Circuit has recognized a bifurcated standard of judicial review of an ALJ's credibility determinations, and that courts are free to more strictly scrutinize such determinations when they are based upon objective factors. *See Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994). However, we do not interpret *Herron*, or any other pertinent caselaw, to autho-

rize a de novo review. Regardless of the standard applied, we find that the ALJ did not err in assessing Schmidt's credibility.

Schmidt directs our attention to the following examples of alleged ALJ error. First, Schmidt contends that the ALJ erred in faulting plaintiff for referring to chest pains suffered in 1976 as a heart attack, essentially because Schmidt should not be penalized for not knowing the precise medical definition of a heart attack. However, the 1976 records from Ingalls Memorial Hospital indicate that plaintiff's EKG readings and enzymes were normal, diagnosing Schmidt with possible angina pectoris. Schmidt fails to offer any explanation as to how such a diagnosis could be confused with a heart attack. Even Schmidt's physicians received conflicting reports—while Dr. Brandfonbrener apparently accepted Schmidt's "heart attack" assessment in his records, Dr. Nader's records dated 11–13–86 indicate that Schmidt had never suffered a myocardial infarction. Accordingly, ALJ Kohler's conclusion that plaintiff was prone to exaggerating the seriousness of his 1976 illness is well founded.

Next, Schmidt claims that ALJ Kohler improperly relied upon a "discrepancy" between his actual stay at Ingalls Hospital in 1976 and the length of time he reported staying during his 1990 examination with Dr. Gil. While Ingall's records indicate a 5–day stay, Schmidt informed Dr. Gil that he was hospitalized for two weeks for the same ailment. We acknowledge that a five-day hospital stay indicates that Schmidt's chest pain was substantial. However, this does not change the fact that Schmidt exaggerated the length of his stay during an examination with the defendant's Consultative Examiner.[8]

Schmidt then attacks ALJ Kohler's observations of how Schmidt's complaints changed as time passed. Schmidt distorts the ALJ's findings by claiming that "instead of reflecting on Plaintiff's credibility, this only reflects the ALJ's failure to recognize that Plaintiff's complaints ... changed as Plaintiff changed his lifestyle." Pl.'s Brf. At 6. We note that plaintiff claims to have "changed his lifestyle"

---

8. Contrary to Schmidt's assertion, we need not find that he "purposefully lied to Dr. Gil." Pl.'s Rsp. At 16. Rather, we need only find that his

recollection was not reliable, and therefore, that his statement was not credible.

in late 1989 or early 1990, by following the advice of Dr. Brandfonbrener (R. 1196). Despite plaintiff's characterization, it is clear that ALJ Kohler found plaintiff incredible because his testimony concerning a *specific point* in time changed over the course of these proceedings.

For example, Schmidt testified at his first hearing on October 8, 1987 that he experienced severe angina pains four to six times a week. However, Dr. Brandfonbrener's progress reports indicate that Schmidt experienced angina two to three times a week in August 1987, and three to four times a week in October 1987. Similarly, at his hearing in 1993, Schmidt claimed that he experienced angina three to four times a *day* in 1988, while Dr. Brandfonbrener's 1988 reports note that Schmidt experienced angina a few times a *week.* In December 1989, Schmidt reported a "severe increase in both frequency and intensity of angina" to the defendant (R. 829). His treadmill test just one month earlier, however, revealed that his cardiac condition had improved.[9]

We are unpersuaded by Schmidt's attempts to explain away these discrepancies as "picayune," the result of confusion, or mere semantics. In addition, ALJ Kohler did not totally discredit plaintiff's accounts of his symptoms. The ALJ acknowledged that Schmidt suffered from a number of medical infirmities that caused "significantly vocationally relevant limitations." (R. 829). ALJ Kohler merely concluded that Schmidt had a tendency to exaggerate his condition when he reported his symptoms to the defendant, which, as demonstrated in these examples, was well founded.[10]

## IV. ALJ KOHLER'S DENIAL OF BENEFITS WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

Schmidt argues that ALJ Kohler's determination that Schmidt was not disabled is not supported by substantial evidence. Before evaluating the medical evidence and vocational testimony, we must first set forth the parameters of our inquiry, as it is bound by the concept of "substantial evidence."

### A. Standard Of Review

Section 205(g) of the Social Security Act ("Act"), 42 U.S.C. § 405(g), authorizes judicial review of an ALJ decision.[11] As a reviewing court, we are not permitted to decide facts anew, reweigh the evidence, or substitute our judgment for the defendants'. *Walker v. Bowen,* 834 F.2d 635, 643 (7th Cir.1987). We will find that the Commissioner's decision is supported by substantial evidence even if reasonable minds would differ as to whether the claimant is disabled. *Id.* at 640. As such, we may reverse the Commissioner's ruling "only if the evidence compels reversal, not merely because the evidence can support a contrary decision." *Gutierrez v. Apfel,* 1998 WL 30690 at *3 (N.D.Ill. Jan.23, 1998); *see also Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir.1990) ("If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence.") However, "if the [Commissioner] committed an error of law, reversal is required without regard to the volume of the evidence in support of the factual findings." *Imani v. Heckler,* 797 F.2d 508, 510 (7th Cir.1986); *cert denied,* 479 U.S. 988, 107 S.Ct. 580, 93 L.Ed.2d 583 (1986). With these standards in mind, we

9. ALJ Kohler also noted that at Schmidt's March 19, 1991 hearing before ALJ Adler, plaintiff claimed that he retired from Montgomery Ward due to his angina. At his April 20, 1993 hearing before ALJ Stillerman, plaintiff again blamed his retirement on his poor health, but instead referenced his rheumatoid and inflammatory arthritis.

10. Moreover, Schmidt claims that ALJ Kohler failed to consider all relevant factors for assessing credibility under the regulations. We disagree. ALJ Kohler discussed plaintiff's daily activities, medications, treatment, and frequency of

pain. The regulations do not require the ALJ to articulate a finding as to each factor. *See* SSR 88–13, 90 et seq. Rather, the ALJ need only articulate the reasons for his credibility finding. SSR 96–7p

11. Section 405(g) provides in pertinent part:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action.

address Schmidt's challenge to the Commissioner's disability determination.

### B. Disability

To qualify for disability benefits, a claimant must be "disabled." The Act defines "disabled" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment" is an impairment resulting "from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Social Security regulations set forth a five-step inquiry to determine whether a claimant is disabled. The Commissioner must determine (1) whether the claimant is presently employed; (2) whether he has a severe impairment; (3) whether his impairment meets or equals one of the Commissioner's listed impairments; (4) whether the claimant can perform his past relevant work; and (5) whether he is capable of performing any work within the economy. 20 C.F.R. § 404.1520; *Schroeter v. Sullivan,* 977 F.2d 391, 393 (7th Cir.1992). A claimant must always satisfy the first two factors, but a finding of disability results if he has a listed impairment or can do neither his previous work nor any other work. *Schroeter,* 977 F.2d at 393.

In reviewing Schmidt's claim, ALJ Kohler noted that Schmidt had not been gainfully employed since 1986. Turning to the medical evidence, ALJ Kohler determined that Schmidt suffers from coronary artery disease, high blood pressure (which was controlled with exercise and medication), angina, minimal bilateral carpal tunnel syndrome, post TIA, a 50% to 75% stenosis right internal carotid artery, emotional problems, and arthritis. ALJ Kohler found that while these impairments would cause significant vocationally relevant limitations, they did not meet or equal a listing.

In so ruling, ALJ Kohler rejected Dr. Brandfonbrener's and Dr. Reich's ultimate conclusions that Schmidt possibly met or equaled a medical listing. Schmidt argues that ALJ Kohler erred because he did not give "good reason" for discounting the opinions of Dr. Reich and Dr. Brandfonbrener. The reason ALJ Kohler supplied for rejecting Dr. Brandfonbrener's and Dr. Reich's opinions were that their conclusions were not supported by a careful reading of the Listings or the opinions of medical advisor Dr. Sommers and the state agency physicians.[12] Schmidt contends that the ALJ should have fully credited the opinions of his treating physicians, and not the opinions of the reviewing physicians.

 Initially, we note that the power to determine whether the plaintiff meets or equals the Listing of Impairments resides solely with the Commissioner. 20 C.F.R. § 404.1527(e) ("A statement by a medical source that you are disabled or unable to work does not mean you are disabled.") When confronted with conflicting medical opinions, it is within the ALJ's discretion to determine which doctor to believe. *Books v. Chater,* 91 F.3d 972, 979 (7th Cir.1996). The ALJ must consider whether the witness is a treating physician, the duration and extent of the treatment relationship, and the veracity of the physician's opinion. 20 C.F.R. § 404.1527(a)–(d). The ALJ may discount medical opinions that contain internal inconsistencies, or that are inconsistent with other evidence. *Id.* at 979. In addition, the ALJ need not accord a treating physician's opinions great weight if is not supported by clinical or diagnostic data. *Id.* The ALJ may even reject a treating physician's opinion in favor of a non-treating physician's conflicting findings. As the Seventh Circuit has stated

---

12. We note that over 400 pages are inexplicably missing from the record on review (pages 220–635). These pages included, among other things, the state agency physicians' opinions. However, this evidence was presented to this Court in *Schmidt I* and was before ALJ Kohler. The parties' briefs, as well as the prior ALJ opinions, are in accord as to the state agency physicians' conclusions—that plaintiff is not disabled. Accordingly, we find it was not error for ALJ Kohler to rely upon these conclusions.

The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. The regular physician also may lack an appreciation of how one case compares with other related cases. A consulting physician may bring both impartiality and expertise.

*Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

■ However, if the ALJ declines to give a medical opinion substantial weight, he must articulate legitimate reasons constituting good cause for doing so. *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir.1995). This is not to say that the ALJ is required to evaluate in writing every piece of the evidence presented. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir.1993) (per curiam). Rather, the ALJ need only "sufficiently articulate his assessment of the evidence to 'assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the path of the ALJs' reasoning.'" *Id.* at 181 (quoting *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir.1985)).

In assessing Schmidt's physical condition, ALJ Kohler noted that Schmidt's treadmill tests consistently demonstrated his ability to sustain a medium work-exertion level. While Schmidt suffers from angina, Dr. Brandfonbrener had referred to the pain as mild. Interestingly, Dr. Sam Ho, the neurologist treating Schmidt following his 1986 transient cerebral ischemia attack, chose not to prescribe Schmidt the blood thinner coumadin, which requires close medical supervision. Instead, Dr. Ho felt that aspirin was sufficient. In reviewing Schmidt's 1986 stress test, Dr. Brandfonbrener found that Schmidt's functional capacity remained above average due to his long history of physical activity. In addition, ALJ Kohler noted a previous example where another physician's diagnosis of Schmidt's condition was less serious then Dr. Brandfonbrener's. Dr. Brandfonbrener found that Schmidt's condition in 1985 necessitated angioplasty and referred Schmidt to Dr. Gruentzig. Upon evaluating Schmidt's files, however, Dr. Gruentzig found that the procedure was unwarranted. Similarly, while Dr. Brandfonbrener believed that Schmidt's physical impairments rendered him unable to work, Dr. Sommers and the State Agency Physicians determined that Schmidt failed to meet any of the criteria of the listed impairments described in Appendix 1 of the Regulations. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1.

Turning to Dr. Reich's opinion, we note that Dr. Reich offered testimony as to Schmidt's mental condition. Schmidt's counsel referred him to Dr. Reich, a clinical psychologist, in October of 1987. After examining Schmidt, Dr. Reich noted a disparity between Schmidt's verbal IQ (121) and his performance IQ (95). Dr. Reich testified that the disparity could indicate mild brain damage, possibly as a result of the transient cerebral ischemia attack suffered in 1986. However, Dr. Reich qualified this finding, noting that the tests alone were insufficient to support the conclusion that Schmidt's practical functioning was impaired. The MMPI results from the interview, Dr. Reich noted, reflected high percentile scores on somatization, obsessive compulsive behavior, and hostility.

In discussing Dr. Reich's testimony, ALJ Kohler noted that Schmidt stopped seeing Dr. Reich in March of 1988, "before a significant patient claimant [sic] relationship developed." (R. 835). ALJ Kohler then categorized Dr. Reich's relationship to Schmidt as a non-treating physician. In contrast to Dr. Reich's assessment of the MMPI results, ALJ Kohler stated that the global severity index of 70 indicated only mild symptoms, citing the DSM–III R Classification GAF Scale.

■ Schmidt takes issue with ALJ Kohler's labeling of Dr. Reich as a non-treating physician, thereby giving less weight to his opinions. However, ALJ Kohler found that Dr. Reich's assessment of a somatoform and obsessive compulsive disorder were valid. They simply were insufficient to meet a listed impairment. Moreover, ALJ Kohler was not required to accept Dr. Reich's statements that were not consistent or that were outside of the scope of the treatment. 20 C.F.R. § 404.1527(d)(3). For example, while Dr. Reich found that Schmidt had no difficulties with social functioning in 1987 and Schmidt testified that he was always aware of the need to get along with his supervisors, Dr.

Reich stated in 1992 that plaintiff had difficulty in getting along with others, particularly those in supervisory roles. And while Dr. Reich testified that he believed plaintiff would put so much pressure upon himself at work that he could die, as a psychologist, Dr. Reich is not qualified to predict, nor had he observed, the physical consequences of plaintiff's psychological condition.[13]

 Schmidt goes on to argue that ALJ Kohler rejects the uncontradicted testimony of the medical experts in concluding that "in addition to Plaintiff's physical impairments, that emotional upset can cause the angina symptoms...." Pl.'s Rp. At 29.[14] This statement belies ALJ Kohler's acknowledgment that Schmidt's "cardiac condition with occlusions of his coronary LAD and internal carotid artery with the psychological factor of severe stress could have caused severe complications such as a stroke and/or myocardial infarction." (R. 837). In so ruling, ALJ Kohler credited the evaluations of Dr. Brandfonbrener, Dr. Reich, and Dr. Nadler, giving them controlling weight. However, ALJ Kohler specifically rejected the doctors' ultimate conclusion that Schmidt is disabled based upon the unwarranted assumption that Schmidt could not handle *any* work stress. This ruling, if supported by substantial evidence, is well within the confines of ALJ Kohler's discretion as a hearing officer. *See Dray v. Railroad Retirement Board,* 10 F.3d 1306, 1313 (7th Cir.1993) ("Whether a claimant is disabled is a legal, not a medical, question—an ultimate conclusion for the hearing officer to make."); *Castellano v. Secretary of Health & Human Services,* 26 F.3d 1027, 1029 (10th Cir.1994) ("the determina-

tion of disability is the ultimate responsibility of the Commissioner, a treating physician's opinion as to claimant's disability is not dispositive.")

### C. Schmidt Could Perform Relevant Work Available In the Economy

 ALJ Kohler determined that Schmidt was able to make a vocational adjustment to low-stress jobs that exist in significant numbers in the economy. This conclusion is consistent with Dr. Nadler's presentation of Schmidt's condition in the Social Security Administration's Medical Report on September 11, 1987. Dr. Nadler indicated that Schmidt could sit for six hours, stand for one hour, and walk for one hour in an eight hour workday. In addition, Schmidt was capable of occasionally lifting 20–25 lbs. and occasionally carrying 11–20 lbs. While Schmidt was unable to use either hand for repetitive actions such as pushing and pulling arm controls, he could perform simple grasping and fine manipulation with both hands. When asked to provide remarks on other functional limitations, Dr. Nadler noted that Schmidt has difficulty handling stressful situations that precipitate angina. Similarly, in his responses answers to the Bureau of Disability Determination Services' Medical Questionnaire on February 13, 1990, Dr. Nadler noted that Schmidt suffered from angina pectoris and that "anxiety reaction with executive duties exacerbate angina [therefore] unable to work at usual an[d] customary employment." (R. 451, 453).

After the Seventh Circuit denied Schmidt's benefits, plaintiff's counsel provided Dr. Na-

---

13. Schmidt then alleges that ALJ Kohler played doctor in a number of instances, but abandons the argument in his reply brief. For example, Schmidt points to ALJ Kohler's interpretation of plaintiff's global severity index rating. However, we do not find that the ALJ's comparison of plaintiff's examination results with the objective DSM–III R Classification GAF Scale constitutes rendering a medical opinion. Moreover, Schmidt mischaracterizes ALJ Kohler's statements when claiming that ALJ Kohler substituted his own opinion for Dr. Reich's when he stated that Dr. Reich's findings of hostility and obsessive behavior demonstrated only recent problems. To the contrary, ALJ Kohler stated that "if the MMPI evaluation is correct the hostility problem like the diagnosis of obsessive behavior

would **not** be a recent occurrence but would be a long standing emotional problem." ALJ Kohler then listed examples over the relevant time period demonstrating Schmidt's ability to get along with others.

14. Schmidt similarly alleges that ALJ Kohler rejected Dr. Gil's psychological report on Schmidt. While ALJ Kohler discounted the reliability of the report based upon certain exaggerated representations Schmidt made to Dr. Gil—such as his alleged two week stay at Ingalls hospital in 1976; and the fact that he lost 25 pounds due to a lack of appetite as opposed to as a result of a diet prescribed by Dr. Brandfonbrener—he did not reject the report outright.

dler with a copy of that opinion and requested that he "clarify [his] opinion of George Schmidt's physical capacities from March 28, 1986 through April 12, 1990." (R. 475). On February 8, 1991, Dr. Nadler composed a two page letter explaining that "[w]hen I commented that Mr. Schmidt can perform work related activities except for 'extreme exertion,' I certainly did not mean to imply that he could perform 'medium' work as defined by the SSA." (R. 475). Dr. Nadler went on to declare that:

Mr. Schmidt is unequivocally unable to meet the "prolonged" standing and/or walking requirements of "light" or "medium" exertion, which amounts to 4–6 hours out of an 8 hour day. Nor could he be expected to lift up to 50 pounds or even 25 pounds frequently. If he had forced himself to perform any of these above requirements it would certainly have exacerbated his cardiac condition and possibly proved fatal to his health, especially in the context of an 8 hour work day, 5 days a week, 2,000 hours per year. My comment was simply within the context of executive duties which are quite sedentary in nature. (R. 475–76).

In criticizing the Seventh Circuit's determination that Schmidt could perform cashier work in a retail store, Dr. Nadler stated,

Physically he could handle that job, just as he could physically handle a managers [sic] job. I have read the psychological report, and while I am not a psychiatrist, I am a physician trained in psychiatric medicine and I have dealt with Mr. Schmidt on a routine basis since 1984. In my opinion low-end jobs would not alleviate his emotional stress. (R. 476).[15]

Just as the Seventh Circuit did before him, ALJ Kohler found that the evidence demonstrated Schmidt could, in fact, handle a low-end job. Schmidt had previously made a successful transition to a relatively "low-end job" when he returned to Montgomery Ward as a District Manager after being fired as the President and CEO of the Singer Corporation. While Schmidt admittedly returned to Wards prior to the onset of his ailments, his

testimony reveals that he assumed the lesser role without incurring stress. ALJ Kohler further noted that the degree to which work and stress are necessarily related has not been clearly established. Moreover, ALJ Kohler found that Schmidt had tolerated other seemingly stressful situations without adverse medical consequences, noting Schmidt's great concern over his "lady friend's" ongoing battle with leukemia had not triggered an adverse physical response. Analyzing Dr. Reich's example of Schmidt always needing to be in control, ALJ Kohler commented that while Schmidt became frustrated with not being able to control his "lady friend's" counseling session, there is no indication he suffered any adverse medical consequences to his inability to direct the course of the session. Schmidt's daily activities, which involved walking approximately 10 blocks, reading the New York Times and books, playing handball, climbing stairs, grocery shopping, and driving, indicate that Schmidt also had the stamina to perform the work—consistent with Dr. Nadler's pre-litigation assessment of Schmidt's abilities.

ALJ Kohler further determined that even if Schmidt lacked the residual functional capacity to return to his former employment, Schmidt could make a successful vocational adjustment to light exertional work. Dr. Williams had testified to Schmidt's numerous transferable vocational skills, such as "the ability to analyze numerical and alphabetic data, to be able to understand the processes and procedures related to management, to control, to coordinate ... to understand the financial records related to the retail industry .... to deal with the public specifically in problem solving." (R. 722). Dr. Williams stated that these skills could be transferred only to jobs within the retail industry. This testimony directly contradicts Dr. Mendrick's and VE Hart's testimony that such skills were transferable to other fields. While Dr. Williams testified that there were no jobs within the retail industry that had little stress, he conceded upon questioning from the ALJ that there were varying degrees of job stress within the retail industry.[16]

---

15. We find that following Schmidt's counsel's request to comment on the Seventh Circuit's findings, Dr. Nadler's assessment of Schmidt's condition became suspiciously more pessimistic.

16. ALJ Adler questioned Dr. Williams' credibility at the hearing, noting that Schmidt was paying Williams nearly four times the average rate. In addition, ALJ Kohler remarked that Dr. Williams

VE Hart testified that a person of Schmidt's age and work history could make a successful vocational adjustment to the position of skilled cashier, semi-skilled payroll clerk, billing clerk, accounting clerk, appointment clerk, and information clerk. VE Hart explained that each of these positions existed in significant numbers in the economy and that based upon the Diagnostic and Statistical Manual for Mental Disorders, the stress level for each position would be minimal. She further testified that the enumerated jobs involved the same work processes, work settings, tools, and industries as plaintiff's past work. The VE stated that she took into account that plaintiff's advanced age required a transferability of skills involving little if any vocational adjustment.

Schmidt challenges VE Hart's testimony and ALJ Kohler's reliance upon it because "in order to establish transferability of skills for [individuals aged 60–64], the semiskilled or skilled job duties of their past work must be so closely related to other jobs which they can perform that they could be expected to perform these other identified jobs at a high degree of proficiency with a minimal amount of job orientation." SSR 82–14, at 202. Unless the claimant has highly marketable skills, the defendant cannot make a finding of transferability. *Tom v. Heckler,* 779 F.2d 1250, 1256 (7th Cir.1985).

■ We note that VE Hart and ALJ Kohler both referenced the requirement of highly marketable skills in assessing Schmidt's transferability. Moreover, "highly marketable" does not mean that the older claimant must be so skilled so as to have an advantage over all other applicants. To the contrary, highly marketable skills simply requires "very little, if any, vocational adjustment ... in terms of work processes, work setting, or the industry." *Tom v. Heckler,* 779 F.2d 1250, 1256 (7th Cir.1985); *Preslar v.*

*Secretary of Health and Human Serv.,* 14 F.3d 1107 (6th Cir.1994) (noting that the Commissioner and most other circuits have rejected the Sixth Circuit's restrictive definition of "highly marketable" as one possessing "those skills which are sufficiently specialized and coveted by employers so as to make a claimant's age irrelevant"). Accordingly, Schmidt's argument that others would be more qualified than he advances an overly restrictive definition of "highly marketable."

In response to Schmidt's denial of ever having performed any of the jobs listed by VE Hart, we note that Schmidt's prior testimony indicates that he has in fact received training for and performed at least one of the referenced positions—skilled cashier. While Schmidt was working at his friend's grocery and drug store, an employee taught him how to use a modern cash register. When he felt that the store manager had carelessly allowed the lines to get too long, Schmidt would open an additional aisle for checkout, and stop ringing-up groceries when the customer's bill reached a certain level. Schmidt then billed the "free groceries" to the manager to teach him a lesson.[17] Moreover, we have uncovered no requirement that Schmidt must have performed the exact positions referenced in order to possess highly transferable skills, particularly in light of his advanced education and impressive prior positions.

Finally, Schmidt points to VE Hart's testimony that Schmidt could not perform any of the listed positions if he was easily fatigued, had back pain after 20 to 40 minutes, and could concentrate only for one-half hour to forty five minutes. To the contrary, ALJ Kohler found that these limitations were contrary to Dr. Nadler's assessment of Schmidt's abilities, and to the activities that Schmidt admitted to performing, such as

---

had a habit of exceeding his expertise in his testimony. Plaintiff's claim that the ALJ was biased against Dr. Williams has been waived. *See Pope v. Shalala,* 998 F.2d 473, 480 n. 6 (7th Cir.1993). While the regulations provide a specific process for resolving claims of ALJ bias, Schmidt failed to comply and present his claim of bias to the Appeals Council. 20 C.F.R. § 404.940; *see also Grant v. Shalala,* 989 F.2d 1332 (3d Cir.1993) (ruling that district courts lack the authority to make independent findings

of fact regarding ALJ bias and that the district court may only review the Secretary's findings concerning ALJ bias under 42 U.S.C. § 405(g)).

17. Illustrative of the manner in which the plaintiff distorts the facts, Schmidt claims that this incident demonstrates only how inept he was as a cashier, implying that he gave away groceries because he was confused. To the contrary, a review of Schmidt's testimony reveals that he knew exactly what he was doing.

driving, walking, playing handball, grocery shopping, and reading the New York Times and books. In addition, ALJ Kohler questioned Schmidt's credibility in reporting such symptoms. Accordingly, we find that ALJ Kohler's determination that Mr. Schmidt had developed highly marketable skills enabling him to transfer to low-stress jobs requiring light exertion was supported by substantial evidence.

## CONCLUSION

In conclusion, it is apparent to this Court that Mr. Schmidt suffers from a number of impairments. Moreover, we acknowledge that reasonable minds could differ as to whether Mr. Schmidt is disabled under the Act. Yet, it is noteworthy that four different ALJs have consistently ruled that Mr. Schmidt is not disabled during the ten years since he filed his claim. In the case presently before this Court, we conclude ALJ Kohler thoroughly reviewed the evidence pertinent to Mr. Schmidt's claim and was convinced that Schmidt was capable of performing other work in the economy. In reaching this conclusion, ALJ Kohler properly referenced and evaluated all relevant testimony. Accordingly, we are bound to accept his conclusion regarding Mr. Schmidt's disability since it is supported by substantial evidence. Therefore, plaintiff's motion for summary judgment is denied, and defendant's motion for summary judgment is granted.