Cathryn A. BRONSON, Plaintiff,

v.

Michael J. ASTRUE,[1] Commissioner of Social Security, Defendant.

No. 06–4142–JAR.

United States District Court, D. Kansas.

Jan. 8, 2008.

---

**1.** In February 2007, Michael J. Astrue was sworn in as the new Commissioner of the Social Security Administration. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is substituted for Commissioner Jo Anne B. Barnhart as the defendant in this suit.

---

Brandi L. Studer, The Midland Group, Denver, CO, Patrick H. Donahue, Midland Professional Associates, Lawrence, KS, for Plaintiff.

Tanya S. Wilson, Office of United States Attorney, Topeka, KS, for Defendant.

### *ORDER ADOPTING RECOMMENDATION AND REPORT*

JULIE A. ROBINSON, District Judge.

Ten days having passed, and no written objections being filed to the proposed findings and recommendations filed by Magistrate Judge John Thomas Reid, and after a de novo determination upon the record pursuant to Fed.R.Civ.P. 72(b), the Court accepts the recommended decision and adopts it as its own.

**IT IS THEREFORE ORDERED** that JUDGMENT be entered in accordance with the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision in accordance with the December 21, 2007 Recommendation and Report (Doc. 20).

**IT IS SO ORDERED.**

### REPORT AND RECOMMENDATION

JOHN THOMAS REID, United States Magistrate Judge.

Plaintiff seeks review of a final decision of the Commissioner of Social Security (hereinafter Commissioner) denying disabled widow benefits (DWB) and supplemental security income (SSI) under sections 202, 216(i), 223, 1602 and 1614(a)(3)(A) of the Social Security Act. 42 U.S.C. §§ 402, 416(i), 423, 1381a, and 1382c(a)(3)(A)(hereinafter the Act). The matter has been referred to this court for a report and recommendation. The court recommends JUDGMENT be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

### I. Background

Plaintiff applied for SSI on Feb. 11, 2003 (R. 44, 90–95) and for DWB on Oct. 8, 2004. (R. 44, 489–92). She alleges onset of disability when she attained age fifty on May 17, 2003. (R. 44, 512). Plaintiff's applications were denied and plaintiff timely sought a hearing before an Administrative Law Judge. (R. 57, 58, 69–70). Plaintiff, who was represented by an attorney, appeared and testified at a hearing on Nov. 4, 2004 and at a supplemental hearing

on Apr. 27, 2005. (R. 509–49). She argued at each hearing that she is disabled because she is over fifty years of age, has no past relevant work, and is limited to performance of sedentary work. *Id.* Between the hearings, the ALJ sought and received answers to interrogatories from a vocational expert. (R. 184–85). The ALJ issued a decision on Jun. 30, 2005 finding plaintiff is not disabled within the meaning of the Act. (R. 44–55).

The ALJ found that plaintiff has not engaged in substantial gainful activity since her alleged onset date. (R. 46). At step two of the sequential evaluation process, the ALJ found that plaintiff has "severe" impairments of degenerative disc disease and a headache disorder, but that plaintiff does not have a mental disorder which is "severe" within the meaning of the Act. (R. 46–49). He found at step three that none of plaintiff's impairments meets or equals the severity of a medical listing and determined that he must assess plaintiff's residual functional capacity (RFC). (R. 49–50). The ALJ determined that plaintiff's allegations of limitations resulting from her impairments are not credible. (R. 51).

The ALJ considered the medical opinions of plaintiff's chiropractor; a psychological consultant, Dr. Mintz; plaintiff's therapists, Marie Frazee, LPC, and Patricia Miller, LMLP, LCP; Plaintiff's treating orthopedic specialist, Dr. Lewonowski; and the state agency medical consultants who had completed a physical RFC assessment form and a Psychiatric Review Technique Form (PRTF) during the state agency reviews of plaintiff's applications. (R. 52, 52A, 53). The ALJ discounted the opinions of Ms. Frazee and Ms. Miller and gave substantial weight to the opinions of the state agency medical consultants regarding plaintiff's mental condition. (R. 52A–53). The ALJ assessed plaintiff with an RFC which falls within the light exertional level. (R. 52).

At step four, the ALJ found that plaintiff has no past relevant work within the meaning of the Act. (R. 53). The ALJ proceeded to the fifth step of the sequential evaluation process, and based upon the answers provided by the vocational expert and using Medical–Vocational Guidelines (hereinafter the grids) Rule 202.13, concluded that plaintiff is able to perform other work existing in significant numbers in the national economy. (R. 53–54). Therefore, the ALJ denied plaintiff's applications. Plaintiff disagreed with the ALJ's decision, provided additional evidence, and sought Appeals Council review. (R. 13–35, 39–40). The Appeals Council found no basis for review and denied plaintiff's request. (R. 6–8). Therefore, the ALJ's decision is the final decision of the Commissioner. (R. 6); *Threet v. Barnhart,* 353 F.3d 1185, 1187 (10th Cir.2003). Plaintiff now seeks judicial review.

## II. Legal Standard

■■■ The court's review is guided by the Act. 42 U.S.C. §§ 405(g), 1383(c)(3). Section 405(g) provides, "The findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive." The court must determine whether the factual findings are supported by substantial evidence in the record and whether the ALJ applied the correct legal standard. *Lax v. Astrue,* 489 F.3d 1080, 1084 (10th Cir.2007); *White v. Barnhart,* 287 F.3d 903, 905 (10th Cir.2001). Substantial evidence is more than a scintilla, but less than a preponderance, it is such evidence as a reasonable mind might accept to support the conclusion. *Zoltanski v. F.A.A.,* 372 F.3d 1195, 1200 (10th Cir. 2004); *Gossett v. Bowen,* 862 F.2d 802, 804 (10th Cir.1988). The court may "neither reweigh the evidence nor substitute [it's]

judgment for that of the agency." *White,* 287 F.3d at 905 (quoting *Casias v. Sec'y of Health & Human Serv.,* 933 F.2d 799, 800 (10th Cir.1991)); *Hackett v. Barnhart,* 395 F.3d 1168, 1172 (10th Cir.2005). The determination of whether substantial evidence supports the Commissioner's decision, however, is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion. *Gossett,* 862 F.2d at 804–05; *Ray v. Bowen,* 865 F.2d 222, 224 (10th Cir.1989).

An individual is under a disability only if that individual can establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months. 42 U.S.C. § 423(d). The claimant's impairments must be of such severity that she is not only unable to perform her past relevant work, but cannot, considering her age, education, and work experience, engage in any other substantial gainful work existing in the national economy. *Id.*

■ The Commissioner has established a five-step sequential process to evaluate whether a claimant is disabled. 20 C.F.R. §§ 404.1520, 416.920 (2005); *Allen v. Barnhart,* 357 F.3d 1140, 1142 (10th Cir. 2004); *Ray,* 865 F.2d at 224. "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir.1988).

In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether she has severe impairments, and whether the severity of her impairments meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). *Id.* at 750–51. If plaintiff's impairments do no meet or equal the severity of a listing, the Commissioner assesses claimant's RFC. 20 C.F.R. §§ 404.1520, 416.920. This assessment is used at both step four and step five of the process. *Id.*

■ After assessing claimant's RFC, the Commissioner evaluates steps four and five—whether the claimant can perform her past relevant work, and whether she is able to perform other work in the national economy. *Williams,* 844 F.2d at 751. In steps one through four the burden is on claimant to prove a disability that prevents performance of past relevant work. *Dikeman v. Halter,* 245 F.3d 1182, 1184 (10th Cir.2001); *Williams,* 844 F.2d at 751 n. 2. At step five, the burden shifts to the Commissioner to show other jobs in the national economy within plaintiff's capacity. *Id.; Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir.1999).

Plaintiff claims the ALJ erred at step two in failing to find that plaintiff's mental impairment is "severe" within the meaning of the Act; and at step five both in finding that there are jobs in the economy of which plaintiff is capable, and in using grid Rule 202.13 to determine that plaintiff is not disabled. The Commissioner argues that the ALJ properly evaluated the severity of plaintiff's mental impairment at step two and properly evaluated the medical opinions upon which the step two determination is based, and that substantial evidence supports the determination. He argues that the ALJ properly used grid Rule 202.13 as a framework for his step five determination, and that substantial evidence supports the determination that there are jobs in the economy of which plaintiff is capable. The court will consider the claims in the order in which they would be reached in applying the sequential evaluation process.

## III. Step Two

Plaintiff claims the ALJ erred at step two in finding that plaintiff's mental impairment is not "severe" within the meaning of the Act because the ALJ accorded too much weight to the opinion of the Commissioner's consultant examiner, Dr. Mintz; and too little weight to the opinions of plaintiff's treating mental health providers. She claims the ALJ failed to consider the information in the third party statement completed by plaintiff's daughter, and erred in failing to allow plaintiff's daughter to testify at the hearing. Finally, she claims the ALJ erred in failing to include in the RFC assessment his findings that plaintiff "has mild restrictions in activities of daily living, mild difficulty maintaining social functioning, and mild difficulty maintaining concentration, persistence, or pace." (Pl.Br. 29). The Commissioner notes that although Ms. Frazee and Ms. Miller treated plaintiff, the treatment involved only one visit each and the mental health providers do not qualify as treating physicians within the meaning of the regulations. He notes that the ALJ considered the opinions of both mental health providers, and that any error in finding Ms. Frazee is not an acceptable medical source was harmless. The Commissioner argues that the ALJ properly applied the Psychiatric Review Technique to evaluate the severity of plaintiff's mental impairment, and that substantial evidence in the record as a whole (including the additional evidence presented to the Appeals Council) supports the ALJ's finding that plaintiff's mental impairment is not "severe" within the meaning of the regulations.

An impairment is not considered severe if it does not significantly limit plaintiff's ability to do basic work activities such as walking, standing, sitting, carrying, understanding simple instructions, responding appropriately to usual work situations, and dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521, 416.921. The Tenth Circuit has interpreted the regulations and determined that to establish a "severe" impairment at step two of the sequential evaluation process, plaintiff must make only a *"de minimis"* showing. *Hinkle v. Apfel,* 132 F.3d 1349, 1352 (10th Cir.1997). Plaintiff need only show that an impairment would have more than a minimal effect on her ability to do basic work activities. *Williams,* 844 F.2d at 751. However, she must show more than the mere presence of a condition or ailment. *Id.* (citing *Bowen v. Yuckert,* 482 U.S. 137, 153, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). If an impairment's medical severity is so slight that it could not interfere with or have a serious impact on plaintiff's ability to do basic work activities, it could not prevent plaintiff from engaging in substantial work activity and will not be considered severe. *Hinkle,* 132 F.3d at 1352.

The Commissioner has promulgated a Psychiatric Review Technique for evaluating mental impairments in a disability case. 20 C.F.R. §§ 404.1520a, 416.920a. In evaluating the severity of mental impairments, the technique provides for rating the degree of functional limitation in each of four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* §§ 404.1520a(c) 416.920a(c). After rating the degree of limitation in each functional area, the Commissioner determines the severity of plaintiff's mental impairments. *Id.* §§ 404.1520a(d), 416.920a(d).

When the first three functional areas are rated as "none" or "mild," and the fourth area is rated as "none," the agency will conclude at step two of the sequential evaluation process that plaintiff's mental impairments are not severe "unless the evi-

dence otherwise indicates that there is more than a minimal limitation in [plaintiff's] ability to do basic work activities." *Id.* §§ 404.1520a(d)(1), 416.920a (d)(1).

Here, plaintiff asserts that her mental impairment is "severe" within the meaning of the regulations. Therefore, she must show that her mental impairment produces more than a minimal limitation in her ability to perform *basic* mental work activities such as understanding, carrying out, or remembering simple instructions; using judgment; responding appropriately to supervision, co-workers, and usual work situations; or dealing with changes in a routine work setting. 20 C.F.R. §§ 404.1521, 416.921 (giving examples of basic work activities—"the abilities and aptitudes necessary to do most jobs"). As discussed above, plaintiff must show more than the mere presence of a mental impairment.

Plaintiff claims that the ALJ erred in weighing the medical opinions, resulting in error in evaluating the severity of plaintiff's mental impairment. Specifically, plaintiff claims the ALJ accorded too much weight to the opinion of the consultant examiner, Dr. Mintz; substituted the ALJ's medical judgment to conclude that the GAF [1] score of 60 Dr. Mintz assigned to plaintiff indicates only mild limitations

rather than moderate limitations; and erroneously accorded too little weight to the opinions of plaintiff's treating mental health providers including two licensed master's level psychologists, Ms. Frazee and Ms. Miller; a social worker, Ms. McDonald; and a psychiatrist, Dr. Williams; all of whom assigned plaintiff GAF scores of 53 or 55.[2] The Commissioner argues that the ALJ did not find plaintiff's mental impairment is "not severe" solely on the basis of his finding regarding Dr. Mintz's GAF; that the ALJ properly considered all of the medical opinions; that Ms. Frazee and Ms. Miller are not "treating sources" within the meaning of the regulations; that the ALJ's error in stating Ms. Frazee is not an "acceptable medical source" is harmless; and that the evidence presented to the Appeals Council does not establish that plaintiff's mental impairment is of greater severity than found by the ALJ.

"Medical opinions" are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [plaintiff's] impairment(s), including [plaintiff's] symptoms, diagnosis and prognosis, what [plaintiff] can still do despite impairment(s), and [plaintiff's]

---

1. A GAF (global assessment of functioning) score is a subjective determination which represents "the clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed.1994)(hereinafter DSM–IV). The GAF Scale considers psychological, social, and occupational functioning on a hypothetical continuum from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 32. GAF is a classification system providing objective evidence of a degree of mental impairment. *Birnell v. Apfel,* 45 F.Supp.2d 826, 835–36 (D.Kan.1999) (citing *Schmidt v. Calla-*

han, 995 F.Supp. 869, 886, n. 13 (N.D.Ill. 1998)).

2. GAF scores of 53, 55, and 60 fall in the range (51–60) defined as, "**Moderate symptoms ... OR moderate difficulty in social, occupational, or school functioning** (e.g. few friends, conflicts with peers or co-workers)." DSM–IV at 32 (emphasis in original). A GAF score in the range 61–70 however, is defined as, "**Some mild symptoms ... OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**" DSM–IV at 32 (emphasis in original).

physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). The regulations include licensed physicians and licensed or certified psychologists within the meaning of "acceptable medical sources." *Id.*, §§ 404.1513(a)(2), 416.913(a)(2). The regulations provide that the Commissioner may use evidence from "other medical sources" such as nurse-practitioners, physician's assistants, and therapists, not on the list of "acceptable medical sources" to show the severity of plaintiff's impairments and how they affect her ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d).

Opinions from any medical source must not be ignored, and will be evaluated by the Commissioner in accordance with factors contained in the regulations. 20 C.F.R. §§ 404.1527(d), 416.927(d); *Soc. Sec. Ruling* (SSR) 96–5p, West's Soc. Sec. Reporting Serv., Rulings 123–24 (Supp. 2007). A medical opinion on the issue(s) of the nature and severity of a claimant's impairments provided by a treating source who has had an ongoing treatment relationship with a claimant is given controlling weight if is (1) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and (2) is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); SSR 96–2p, West's Soc. Sec. Reporting Serv., Rulings 111–15 (Supp.2007); *see also,* 20 C.F.R. §§ 405.1502, 416.902(defining "treating source").

This is so because a physician who has treated a patient frequently over an extended period of time is expected to have greater insight into the patient's medical condition. *Doyal v. Barnhart,* 331 F.3d 758, 762 (10th Cir.2003). But, "the opinion of an examining physician who only saw the claimant once is not entitled to the sort of deferential treatment accord-

ed to a treating physician's opinion." *Id.* at 763 (citing *Reid v. Chater,* 71 F.3d 372, 374 (10th Cir.1995)). However, opinions of examining sources are generally given more weight than the opinions of non-examining sources who have merely reviewed the medical record. *Robinson v. Barnhart,* 366 F.3d 1078, 1084 (10th Cir. 2004); *Talbot v. Heckler,* 814 F.2d 1456, 1463 (10th Cir.1987) (citing *Broadbent v. Harris,* 698 F.2d 407, 412 (10th Cir.1983), *Whitney v. Schweiker,* 695 F.2d 784, 789 (7th Cir.1982), and *Wier ex rel. Wier v. Heckler,* 734 F.2d 955, 963 (3d Cir.1984)).

Here, the ALJ discussed several opinions regarding plaintiff's mental impairment. He discussed the opinions of Michelle Chambers of Hull Chiropractic Clinic; of Dr. Mintz, a consultant psychological examiner; of Ms. Frazee and Ms. Miller, therapists who each examined plaintiff one time; and the opinions of the state agency medical consultants who had completed a physical RFC assessment form and a Psychiatric Review Technique Form (PRTF) during the state agency reviews of plaintiff's applications. (R. 52, 52A, 53).

As the ALJ noted, Michelle Chambers, of Hull Chiropractic Clinic opined that plaintiff's impairments are uncomfortable but are not permanent and should not preclude plaintiff from holding a job. (R. 52)(citing Ex. 4F/135 (R. 294)). The ALJ determined not to give this opinion substantial weight because Ms. Chambers is not an "acceptable medical source," and because other evidence in the record indicates plaintiff has limitations in work activities. (R. 52).

The ALJ noted Dr. Mintz's opinion that plaintiff is able to understand simple and intermediate instructions and has adequate concentration. (R. 52). He recognized that Dr. Mintz assigned plaintiff a GAF score of 60, and acknowledged that GAF

scores in the range 51–60 represent moderate limitations in psychological functioning while scores in the range of 61–70 indicate "only mild limitations and generally functioning pretty well." *Id.* He concluded that Dr. Mintz did not find plaintiff's mental impairment limited her ability to perform basic work activities:

> GAF scores include Axis IV factors, which in [Dr. Mintz's report] were noted to be the claimant's unemployment, reported medical problems, and pain, which were considered severe. Therefore, the GAF of 60, which is only 1 point below a GAF which would indicate only mild limitations, reflects other factors than the claimant's mental functioning. Dr. Mintz' [sic] conclusions clearly show that he considers the claimant mentally capable of sustaining employment.

(R. 52–52A).

Plaintiff claims the ALJ summarily concluded plaintiff's mental impairment is not severe based on Dr. Mintz's GAF score, and improperly substituted his own medical judgment that Dr. Mintz's GAF score of 60 "was close enough" to a score of 61 and, therefore, indicated only mild rather than moderate limitations in ability to perform basic work activities. Plaintiff's argument fails for several reasons. First, it is the ALJ's duty to evaluate the medical opinions and assign and explain the weight given to each medical opinion. 20 C.F.R. §§ 404.1527(d), 416.927(d). The fact that an ALJ may prefer one medical opinion over another or may interpret a medical opinion such that the opinion is internally consistent does not invariably mean that the ALJ has substituted his medical judgment for that of the medical source. Plaintiff does not provide a citation to support her argument that the ALJ erred in substituting his medical judgment for that of Dr. Mintz, but a leading case in this circuit for such a proposition is *Winfrey v. Chater,* 92 F.3d 1017 (10th Cir.1996). In *Winfrey,* the court found that the ALJ had overstepped his bounds when he substituted his medical judgment for that of Dr. Spray. *Id.* at 1022. The ALJ in *Winfrey* rejected Dr. Spray's opinion because the ALJ found that the test relied upon by Dr. Spray was an insufficient basis to make a diagnosis. *Id.* However, as the court noted, a physician, Dr. Goodman, did not suggest that Dr. Spray's reliance upon the test was improper. *Id.* Thus, the ALJ in *Winfrey* substituted his own medical judgment that the test was inadequate and was without a medical basis for doing so.

Second, the ALJ here did not substitute his own medical judgment regarding plaintiff's GAF score. Rather, he explained why he accepted Dr. Mintz's opinion *as he interpreted it* (that plaintiff's mental problems do not have more than a minimal effect on her ability to perform basic work activities), despite the doctor's assigning a GAF score of 60. The ALJ noted that GAF scores are in a continuum, and although a score of 60 is in the range indicating moderate limitations in psychological functioning, it is merely one point lower than the range indicating "only mild limitations and generally functioning pretty well." (R. 52). He noted that a GAF score includes all problems affecting a patient, and that in this particular case Dr. Mintz's report reflects that his GAF score included problems of unemployment, medical problems, and pain, all of which were considered severe. (R. 52)(citing Ex. 7F/151–152 (R. 344–45)). He also noted that Dr. Mintz's "conclusions clearly show that he considers the claimant mentally capable of sustaining employment." (R. 52A). The ALJ weighed Dr. Mintz's opinion, he did not substitute his own medical judgment.

Third, the ALJ recognized that the problems considered in Dr. Mintz's GAF score assessment, but which were not related specifically to plaintiff's mental impairment (i.e. unemployment, physical medical problems) had been accounted for elsewhere in the ALJ's decision, and should not be used additionally to increase the severity assigned to plaintiff's mental impairment. He based his finding regarding Dr. Mintz's opinion on his analysis regarding the totality of Dr. Mintz's report, and consideration of factors as explained in the ALJ's decision.

Finally, the ALJ specifically noted that he had given substantial weight to the opinions of the state agency medical consultants. Those consultants, who had also considered Dr. Mintz's report and noted Dr. Mintz's opinion that plaintiff's attention, concentration, and memory were adequate, also found that plaintiff's mental impairment is not severe. (R. 348–64). The ALJ did not substitute his medical judgment for that of the physicians, rather, he weighed the medical opinions, explained his understanding of Dr. Mintz's opinion, and accepted Dr. Mintz's and the consultants' opinions that plaintiff's mental impairment is not severe.

The ALJ's determination is supported by the explanation of GAF scores in the American Psychiatric Association's Diagnostic and Statistical Manual (DSM–IV). DSM–IV instructs practitioners to "Consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. Do not include impairment in functioning due to physical (or environmental) limitations." DSM–IV at 32. Thus, it was appropriate for the ALJ to discount that portion of Dr. Mintz's GAF which included unemployment and (physical) medical problems. The GAF definition of range 51–60 indicates moderate symptoms *or* moderate difficulty in

social, occupational, *or* school functioning; and the definition of range 61–70 indicates mild symptoms *or* some difficulty in social, occupational, *or* school functioning. DSM–IV at 32. Therefore, while a GAF score says something in a very general way about ability to perform basic work activities, the specific score assigned may relate more particularly to social or school functioning rather than occupational functioning. Consequently, that the ALJ related Dr. Mintz's GAF score to his narrative report supports rather than detracts from the ALJ's analysis.

Plaintiff's argument that Dr. Mintz's GAF score of 60 is consistent with the GAF scores of 53 and 55 assigned by Ms. Frazee and Ms. Miller is not persuasive because it does not address which particular aspect(s) of functioning is primarily reflected in the particular GAF scores. The therapists' GAF scores may be addressing overall symptoms or social functioning rather than occupational functioning, which is the issue at step two of the sequential evaluation process.

The ALJ addressed the opinions of plaintiff's therapists, Ms. Frazee and Ms. Miller. (R. 52A). He noted that Ms. Frazee's opinion was expressed in a mental health center intake evaluation, and that Ms. Miller's opinion was expressed in Dec. 2004 treatment notes. *Id.* He discounted Ms. Frazee's opinion because "Ms. Frazee did not record any objective findings of disabling mental limitations," because Ms. Frazee is not an acceptable medical source, because Ms. Frazee's GAF score reflects factors in addition to mental functioning such as plaintiff's financial problems, and because Ms. Frazee's records do not reflect significant mental limitations beyond plaintiff's subjective reports which the ALJ found not credible. *Id.* He discounted Ms. Miller's opinion because Ms. Miller's records also reflect problems be-

yond mental functioning, and reflect only mild limitations in mental functioning. *Id.*

Plaintiff claims the ALJ improperly disregarded the therapists' opinions, arguing that the therapists are Licensed Master's Level Psychologists qualifying as treating sources within the meaning of the regulations, and that the ALJ dismissed all of the GAF scores because of his own conclusion that the scores reflect problems in areas other than "mental health functioning." (Pl.Br. 27). The Commissioner appears to agree that both therapists are "acceptable medical sources," but argues that neither therapist is a "treating source" since the record reflects only one visit to each therapist. He argues that the ALJ properly evaluated the therapists' opinions even if he erred in stating Ms. Frazee is not an "acceptable medical source."

A Licensed Master's Level Psychologist (LMLP) is a licensed psychologist in the state of Kansas, and has been found to be an "acceptable medical source" within the meaning of the regulations. *West v. Barnhart,* No. Civ. A. 02–1007, slip op. at 9–10 (D.Kan. May 5, 2003). Thus, plaintiff is correct to argue that the opinion of an LMLP should be evaluated as a medical opinion. (Pl.Br. 26)(citing *http://www. ksbsrb.org/masters-psychologists.html.*) Plaintiff asserts that both Ms. Frazee and Ms. Miller are Licensed Clinical Psychotherapists (LCP) which are, of necessity, also LMLPs. (Pl.Br. 26). The record reveals that plaintiff is correct as to Ms. Miller, but not as to Ms. Frazee. Ms. Miller signed her name with LMLP, LCP. As the Kansas Behavioral Sciences Regulatory Board web site reveals, an LMLP may seek licensing as a Licensed Clinical Psychotherapist (LCP) under certain conditions. As the record reveals, Ms. Miller is an LMLP who is also an *LCP.* Ms. Frazee, however, is an *LPC.* (R. 399, 400).

The Kansas Behavioral Sciences Regulatory Board web site reveals that LPC is the designation of a Licensed Professional Counselor, not a Licensed Clinical Psychotherapist. Kansas Behavioral Sciences Regulatory Board web site, available at: *http://www.ksbsrb.org/pro-counselors.html* last visited Dec. 11, 2007. Although the two specialities are no doubt similar, one of the major differences between the two is that LMLP or LCP licensure requires a masters degree in the field of psychology whereas the LPC requires a masters degree in counseling. *Compare http://www. ksbsrb.org/masters-psychologists.html; with http://www.ksbsrb.org/pro-counselors. html* last visited Dec. 11, 2007. Ms. Frazee is a Licensed Professional Counselor (LPC), *not* a licensed psychologist (LMLP or LCP) and, as determined by the ALJ, is not an "acceptable medical source." It was not error for the ALJ to note that Ms. Frazee is not an "acceptable medical source." Ms. Miller is an "acceptable medical source," and the ALJ did not find otherwise.

Neither therapist, however, qualifies as a "treating source" within the meaning of the regulations. As the Commissioner argued, a "treating source" must have an ongoing treatment relationship with the claimant. 20 C.F.R. §§ 404.1502, 416.902. So far as the record reveals, each therapist had but a single examination of plaintiff. (R. 399–400, 438). In accordance with the definitions in the regulations, Ms. Miller, as a licensed psychologist is a "nontreating source" who examined plaintiff but did not have an ongoing treatment relationship with plaintiff. 20 C.F.R. §§ 404.1502, 416.902. Ms. Frazee is an "other medical source" who did not have an ongoing treatment relationship with plaintiff. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1).

Although Ms. Frazee is an "other medical source," an ALJ must:

explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06–03p, West's Soc. Sec. Reporting Serv., Rulings 333 (Supp.2007). The Tenth Circuit recently recognized the procedures SSR 06–03p requires to be applied in evaluating the opinions of such "other medical sources." *Frantz v. Astrue,* 509 F.3d 1299, 1300–02 (10th Cir.2007).

Here, the ALJ evaluated and explained his evaluation of the opinions of Ms. Frazee and Ms. Miller. He did not merely dismiss Ms. Frazee's and Ms. Miller's GAF scores because of his own medical judgment. The ALJ noted that the GAF score assigned by Ms. Frazee reflects factors in addition to mental functioning, and he specifically mentioned that Ms. Frazee's evaluation included stressors such as plaintiff's financial problems. With regard to the GAF assigned by Ms. Miller, the ALJ noted it included considerations of severe problems in areas other than mental functioning. As discussed above, it is appropriate for the ALJ in evaluating the severity of mental impairments at step two of the evaluation process to consider only those factors which relate to plaintiff's mental ability to perform basic work activities. Plaintiff points to no evidence that the areas mentioned by the ALJ related to plaintiff's ability to perform basic mental work activities. Beyond her disagreement with the weight assigned the various medical opinions, plaintiff points to no evidence which establishes that the opinions of Ms. Frazee (an "other medical source" who examined plaintiff one time) or Ms. Miller (a "nontreating source" who examined plaintiff one time) must in the circumstances of this case be accorded greater weight than the opinions of Dr. Mintz (a "nontreating source" who examined plaintiff one time) or of the state agency consultants ("nonexamining sources" who reviewed the record). Plaintiff has shown no error in the ALJ's consideration of the opinions of plaintiff's therapists, plaintiff's chiropractor, Dr. Mintz, or the state agency consultants. The ALJ explained his consideration and understanding of the opinions, and his findings are supported by substantial evidence in the record.

Plaintiff submitted additional evidence to the Appeals Council including medical records from Four County Mental Health Center for the period from Nov. 8, 2005 through May 4, 2006. (R. 14–25). Those records include plaintiff's reports of mental symptoms similar to those reported in medical evidence appearing elsewhere in the record. *Compare,* Dr. Drazek's report (R. 196–98)(depression, chronic pain, difficulty sleeping); Dr. Mendiola's records (R. 199–293)(depression, chronic pain); Dr. Jenkins's report (R. 330–33)(chronic pain); Dr. Mintz's report (R. 343–45)(chronic pain, depression, can't do things with grandson, unable to do past activities, low motivation, social withdrawal, reported memory loss, forgetfulness); Dr. Chase's records (R. 373–91)(depressed, reduced sleep, chronic pain, poor sleep, concentration diminished, isolative); *and* Ms. Frazee's report (R. 399–400)(not restful sleep, depression, no pleasure in activities, doesn't want to be around others, low self image, suicidal ideation but no plan). The additional evidence includes GAF scores of 53 and 55 assigned by a social worker, Ms. McDonald, and a GAF score of 55 assigned by a psychiatrist, Dr. Williams. (R. 14, 15, 21, 25).

The Appeals Council considered the additional evidence and determined there was no reason in the regulations to review

the ALJ's decision. (R. 6). The Appeals Council denied review, stating (1) that the additional evidence is from a time period after the ALJ's decision and (2) that the additional evidence does not show a greater level of severity in plaintiff's impairments which relates back to the time period considered by the ALJ. (R. 6–7).

Plaintiff claims the additional evidence establishes that plaintiff's mental impairments "would interfere or have a serious impact on her ability to do basic work activities" (Pl.Br. 28), and relates back to the time before the ALJ's decision because Ms. McDonald opined that plaintiff's GAF score of 53 was the highest GAF plaintiff had during the year before the GAF score was assigned. (Reply 3). While the court agrees with plaintiff that the GAF score assigned by Ms. McDonald refers to the period before the ALJ's decision, it also agrees with the Appeals Council that the additional evidence does not establish a greater level of severity in plaintiff's mental impairment than that found by the ALJ.

As demonstrated by the court's citations above to the administrative record, plaintiff's symptoms revealed in the additional evidence are the same as the symptoms revealed in the records before the ALJ. Plaintiff does not point to evidence that establishes the severity of her mental impairment is worse than that considered and found by the ALJ. The GAF scores assigned by Ms. McDonald and Dr. Williams are the same as those assigned by Ms. Frazee and Ms. Miller. Plaintiff does not point to particular additional evidence that shows the ALJ missed the significance of the earlier evidence. Plaintiff points to nothing in or about the new evidence that is different than that before the ALJ and which would cause or require the ALJ to change his analysis and find that plaintiff's mental impairment is "se-vere." The court finds no error in the Appeals Council's evaluation of the additional evidence.

In arguing that the ALJ erred in finding plaintiff's mental impairment is not "severe," plaintiff argued that her daughter attempted to testify at the hearing, that the ALJ did not allow the testimony, and that the ALJ "erred by failing to consider the third party opinion regarding Mrs. Bronson's impairments." (Pl.Br. 29)(citing *Blea v. Barnhart*, 466 F.3d 903, 915 (10th Cir.2006)). Plaintiff's argument is not entirely clear. If plaintiff is arguing that the ALJ erred in failing to consider the third-party questionnaire her daughter completed, her argument fails. In *Adams v. Chater*, the Tenth Circuit declined the "claimant's invitation to adopt a rule requiring an ALJ to make specific written findings of each witness's credibility, particularly where the written decision reflects that the ALJ considered the testimony." *Adams v. Chater*, 93 F.3d 712, 715 (10th Cir.1996). In *Blea*, cited by plaintiff, the Tenth Circuit emphasized the portion of the *Adams* holding which would not require specific written findings "only if 'the written decision reflects that the ALJ considered the testimony.'" *Blea*, 466 F.3d at 915 (quoting *Adams*, 93 F.3d at 715). Here, the ALJ noted and summarized the daughter's third-party questionnaire. (R. 47). Subsequently, he made a credibility finding regarding that questionnaire: "The third party statement by the claimant's daughter does not reflect the activity levels reported by the claimant to her chiropractor and therefore is also not credible." (R. 51). The decision reflects both that the ALJ considered plaintiff's daughter's third-party questionnaire and that he made a specific, written finding regarding the credibility of that report.

Perhaps plaintiff is arguing that the ALJ erred in not allowing plaintiff's

daughter to testify at the hearing. However, plaintiff cites no authority for the general proposition that an ALJ must allow third-party testimony, for the proposition that the decision not to allow the testimony in this case in particular was error, or that plaintiff was prejudiced by that decision. Plaintiff does not allege that her daughter would have provided any testimony in addition to the evidence provided in her third-party questionnaire which would indicate that plaintiff's mental impairment has more than a minimal effect on her ability to perform *basic work activities*. In fact, plaintiff's only argument is the bare assertions that her daughter attempted to testify, the ALJ refused to allow the testimony, and the ALJ erred in failing to consider her daughter's opinion.

The transcript of the hearing reveals that plaintiff's attorney attempted to question plaintiff's daughter:

ATTY: Your Honor, her daughter is here, I think some of the testimony would simply be corroborative. If you'd like to hear from her.

ALJ: Well, I usually don't call relatives and friends because usually it's just cumulative. I've often found that when they are called there's usually contradictory testimony that I have to deal with.

ATTY: Um-hum. I'll just proffer that the daughter would testify that, that, you, know, her mother cleans the house of a friend of theirs to make a little bit of money. Then what the result of that is the daughter has to go over and clean the mother's house, she doesn't have the strength to do it after she's done the house she gets paid for.

ALJ: And she does that house once a month?

ATTY: Yes—oh, no, once a week.

ALJ: Once a week.

ATTY: She's not required to move any furniture or do any heavy work anymore—

(R. 526–27). At this point, the record reveals plaintiff interrupted her attorney and the ALJ never returned to the proffered testimony.

As the quoted colloquy reveals, plaintiff's attorney suggested that the daughter's testimony would be cumulative ("corroborative"). However, he proffered that the daughter would testify that plaintiff cleaned house for a friend once a week and was thereafter unable to clean her own house and the daughter had to clean plaintiff's house. There is no indication in the record, or argument in plaintiff's briefs that the daughter would be able to present any other noncumulative testimony. Moreover, plaintiff does not explain how the proffered testimony might suggest that plaintiff's mental impairment is "severe" within the meaning of the Act. Plaintiff shows no prejudice from the decision to disallow the testimony. At least as it relates to the step two analysis, the court finds no error in the ALJ's decision to disallow the testimony of plaintiff's daughter.

Finally, plaintiff claims the ALJ found that plaintiff has mild restrictions in activities of daily living; mild difficulty maintaining social functioning; and mild difficulty maintaining concentration, persistence, or pace; but erred by not including these restrictions in his RFC assessment or in the hypothetical question presented to the vocational expert. (Pl. Br. 29). Plaintiff's argument misses the difference between application of the Psychiatric Review Technique at steps two and three and at steps four and five of

the sequential evaluation process. If in applying the technique, the Commissioner determines at step three that plaintiff's mental impairments do not meet or equal a listing, she will then assess plaintiff's RFC. 20 C.F.R. §§ 404.1520a(d)(3), 416.920a (d)(3).

In determining RFC, the regulations provide that the Commissioner will consider plaintiff's "ability to meet certain demands of jobs, such as physical demands, mental demands, sensory requirements, and other functions." *Id.* §§ 404.1545(a), 416.945(a). The Commissioner has clarified the difference between evaluating the severity of mental limitations at steps two and three based upon the functional areas identified in the psychiatric review technique and evaluating the ability to meet mental demands of jobs at steps four and five. SSR 96–8p, West's Soc. Sec. Reporting Serv., Rulings 147 (Supp.2007). "The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in" the four functional areas. *Id.* RFC must be expressed in terms of work related function. *Id.* at 148. "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* at 149. Therefore, an ALJ will not state a mental RFC in terms of the four functional areas, but will make a function-by-function assessment of each of the work-related mental activities relevant to the case at hand.

Here, the ALJ applied the Psychiatric Review Technique, and at step two evaluated the four basic functional areas and determined that plaintiff's mental impairment is not "severe" within the meaning of the regulations. In other words, the ALJ found that plaintiff's mental impairment has no more than a minimal effect on her ability to perform basic work-related mental activities. Before evaluating step four, the ALJ assessed plaintiff's RFC. (R. 50–53). That RFC does not include any work-related mental limitations.

The ALJ found at step two of the sequential process that plaintiff has certain mild restrictions in mental functioning which have no more than a minimal effect on her ability to perform basic work activities. The ALJ's RFC assessment reflects his finding that plaintiff's mild restrictions in mental functioning do not produce significant limitations in her residual functional capacities for understanding, carrying out, and remembering instructions; using judgment in making work-related decisions; responding appropriately to supervision, coworkers and work situations; or dealing with changes in a routine work setting. Plaintiff argues that the ALJ did not include mild mental limitations in assessing plaintiff's RFC, but she does not point to specific limitations in the work-related mental activities described above which are contained in the evidence and which should have been included in the RFC assessment.

The court has considered all of plaintiff's arguments alleging error at step two, and finds no error in the Commissioner's step two evaluation.

## IV. Step Five

Plaintiff makes three specific claims of error at step five. First, she claims the ALJ erred in accepting the vocational expert's (VE) testimony that plaintiff's RFC reduces the range of light work available to plaintiff only by five to ten percent, because this reduction is not contained in

the Dictionary of Occupational Titles (DOT) and was not properly explained by the vocational expert or the ALJ. Second, she claims error in accepting the representative light work the VE said was available to plaintiff because that work requires frequent or constant reaching although the ALJ found plaintiff was incapable of reaching. Finally, plaintiff claims the ALJ erred in using grid Rule 202.13 because the ALJ found nonexertional limitations including pain and postural limitations in plaintiff's RFC. The Commissioner argues that the ALJ properly credited the VE testimony and properly used grid Rule 202.13 as a framework for decision and sought VE testimony to determine the amount of available work in the light exertion occupational base. The court begins by addressing the propriety of relying upon the representative work the VE said was available for someone of plaintiff's age, education, experience, and RFC.

As plaintiff's brief suggests, the ALJ submitted interrogatories to the VE, and the VE provided answers. (R. 184–85). In her answers, the VE indicated that a person of plaintiff's age, education, work experience, and the RFC assessed by the ALJ would have limitations in the occupational bases of which she was capable. (R. 185). Specifically, she noted that the medium occupational base was eliminated, the light occupational base was reduced only by five to ten percent due to postural limitations and limitations in overhead lifting or reaching, and there was no reduction in the sedentary occupational base. *Id.* The VE provided two representative examples of sedentary work and two examples of light work of which a person with the age, education, experience, and RFC of plaintiff would be capable, and stated that to the best of her knowledge, her responses are consistent with the DOT. *Id.* The representative examples of light work provided by the VE are "ticket

seller, DOT code 211.467–030" and "photographic machine operator, DOT code 207.685–018." *Id.*

The ALJ provided a copy of the VE's responses to the interrogatories to plaintiff and sought her response to the ALJ's intention to include the interrogatories as evidence in the record. (R. 186–89). Plaintiff made no comments regarding the interrogatories, and did not immediately submit additional evidence in that regard, but she did "request a *supplemental hearing* to discuss [the] evidence." (R. 190–91)(emphasis in original). Plaintiff's request was granted, and a supplemental hearing was held on Apr. 27, 2005. (R. 530–49). At the supplemental hearing plaintiff did not attack the qualifications of the VE or seek to have her testimony excluded from the record. She does not do so here.

■ Plaintiff claims that the representative light work proposed by the VE (ticket seller, and photographic machine operator), require frequent or constant reaching but the RFC assessed for plaintiff precludes reaching, and, therefore, the two light representative jobs must be eliminated. Plaintiff is correct that the two representative jobs require frequent or constant reaching, but that does not establish error in the ALJ's reliance on those jobs as testified by the VE. Plaintiff's argument misconstrues the RFC assessed in this case. The RFC assessed included nonexertional limitations:

> The claimant has nonexertional limitations of no more than occasional balancing, climbing, stooping, kneeling crouching, and crawling as a result of neck and back pain and to avoid exacerbating headaches. She must avoid *overhead lifting and reaching.*

(R. 52) (emphasis added).

Plaintiff attempts to assert the ALJ found plaintiff must avoid reaching. How-

ever, the RFC applied the qualifier "overhead" in the phrase requiring that plaintiff avoid lifting and reaching ("avoid overhead lifting and reaching"). Therefore, the natural sense of the RFC assessment is that plaintiff must avoid overhead reaching and overhead lifting. The RFC does not preclude reaching or lifting that does not constitute overhead reaching or lifting. To apply the sense in which plaintiff attempts to understand the RFC finding, the decision would have needed a comma placed after "lifting," (overhead lifting, and reaching), or it might have been phrased, "avoid reaching or overhead lifting." The ALJ used neither technique, and the court will not strain for a meaning beyond the natural sense of the phrase.

The court's understanding of the ALJ's RFC assessment is supported by the very facts upon which plaintiff relies to assert error. The interrogatories presented to the VE included an RFC finding "No overhead lifting or reaching." (R. 185). The VE stated that the light occupational base is reduced five to ten percent "with regard to postural limits & overhead lifting or reaching." *Id.* Thereafter, the VE stated that ticket seller, and photographic machine operator were representative jobs available to plaintiff, provided specific DOT codes for each job, and stated that her responses were consistent with the DOT. *Id.* However, as plaintiff argued, each job requires constant or frequent reaching. The most reasonable resolution of these facts is that the VE understood the RFC to preclude overhead reaching but not reaching elsewhere. Otherwise, one must assume either that the VE is not an expert or that she utterly failed to compare the RFC given with the DOT code she supplied in response to the inter-

rogatories for the representative work suggested. In the facts of this case, and accepting the natural sense of the ALJ's RFC assessment, there is no need to make either assumption, and the court will not accept plaintiff's suggestion. The court finds no error in accepting the representative jobs suggested by the VE.

 Plaintiff claims that because the DOT does not contain evidence that the light occupational base is reduced five to ten percent as a result of postural activities being limited to occasional, and overhead lifting and reaching being precluded, it was error for the ALJ to accept the VE's assertion to that effect. Plaintiff claims that the VE's assertion is inconsistent with the DOT and the ALJ was, therefore, required to provide a reasonable explanation for the inconsistency if he is going to rely upon the VE's assertion. (Pl.Br., 22)(citing *Haddock v. Apfel*, 183 F.3d 1225, 1231 (10th Cir.1999)) [3].

In November, 1999, the Tenth Circuit decided that before an ALJ may rely on VE testimony, the ALJ has a duty to ask the VE how the testimony corresponds with the DOT and to elicit a reasonable explanation for any conflict. *Haddock v. Apfel*, 196 F.3d 1084, 1089 (10th Cir.1999). The court made clear that the DOT does not "trump" VE testimony, but the ALJ has a duty to investigate and get a reasonable explanation before he may rely on the VE testimony. *Id.* at 1091.

On June 20, 2000, the Commissioner published Acquiescence Ruling 00–3(10) in which she explained that she would apply the holding of *Haddock* within the Tenth Circuit although that holding conflicted with her interpretation of the Act. Acquiescence Ruling 00–3, West's Soc. Sec. Re-

---

**3.** The opinion plaintiff cited was superseded by *Haddock v. Apfel,* 196 F.3d 1084 (10th

Cir.1999).

porting Serv., Rulings, 480 (2007 Supp.). Thereafter, the Commissioner published SSR 00–4p, effective December 4, 2000. West's Soc. Sec. Rep. Serv., Rulings, 242 (Supp.2007). In SSR 00–4p, the Commissioner rescinded Acquiescence Ruling 00–3(10), and established a policy interpretation for the use of VE testimony and "Other Reliable Occupational Information in Disability Decisions." *Id.* at 243. In the ruling, the Commissioner placed two duties on the ALJ. First, the ALJ must "identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs ... and information in the Dictionary of Occupational Titles (DOT), *including its companion publication,* the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO)." *Id.* (emphasis added).

Second, the ALJ was given the duty to "[e]xplain in the determination or decision how any conflict that has been identified was resolved." *Id.* Ruling 00–4p places the affirmative responsibility on the ALJ to "[a]sk the VE ... if the evidence he or she has provided conflicts with information provided in the DOT," and where VE "evidence appears to conflict with the DOT, ... [to] obtain a reasonable explanation for the apparent conflict." *Id.* at 246.

■■■ Thus, the ALJ in this case had a duty to identify any conflicts between the DOT and the VE testimony and to explain how those conflicts were resolved. Plaintiff claims there is such a conflict in this case which the ALJ failed to identify and resolve. The court disagrees. The Commissioner takes notice of reliable job data such as in the DOT. 20 C.F.R. §§ 404.1566(d), 416.966(d). The Commissioner also uses vocational experts to help resolve complex occupational issues. *Id.* §§ 404.1566(e), 416.966(e). This case illustrates the need for both sources of occupa-

tional expertise. The DOT contains data regarding the broad range of individual occupations available within the economy and classifies these occupations according to several criteria including exertional level. Within the sedentary classification, the Commissioner recognizes approximately 200 unskilled occupations; 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 201.00(a); and approximately an additional 1400 unskilled occupations within the light classification. 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 202.00(a). Each occupation classified as "light" in the DOT has particular requirements regarding postural and manipulative abilities. For example, as discussed above the light occupations provided as representative occupations of which plaintiff is capable require constant or frequent reaching. Certain light occupations may require occasional postural activities, while others may require frequent postural activities.

It is partly for this reason that the ALJ in this case sought VE testimony. He asked the VE how much each occupational base was reduced by the RFC assessed in this case, and the factors which required that reduction in the occupational base. (R. 185). The VE responded that the occasional postural limitations and the limitations on overhead reaching and lifting would reduce the light occupational base of 1400 occupations by five to ten percent. (R. 185). This information does not conflict with the DOT, but specifically relies upon the DOT for its significance. The VE did not present information in addition to or inconsistent with the DOT, but she interpreted the DOT and explained to the ALJ its significance in this particular case. Plaintiff does not object to the qualifications of the VE, and has shown no error or inconsistency in the VE testimony. She merely argues that the VE testimony is inconsistent with the DOT, but it is not.

The ALJ fulfilled his duty pursuant to SSR 00–4p and *Haddock.* He sought to identify any conflicts between the DOT and the VE testimony, and found none. Plaintiff does not identify any conflict. The court finds no error in accepting the VE testimony.

Finally, plaintiff claims the ALJ erred in using grid Rule 202.13 to determine that plaintiff is not disabled. Plaintiff quotes *Frey v. Bowen,* 816 F.2d 508, 512 (10th Cir.1987) for the proposition that the grids may not be used when a nonexertional impairment limits a claimant's ability to perform the full range of work in a particular occupational base. (Pl.Br. 30–31)(quoting *Frey,* 816 F.2d at 512; and citing *Espinosa v. Sec'y or Health and Human Servs.,* 565 F.Supp. 810, 815 (D.Kan.1983)). Therefore, plaintiff argues that the five to ten percent reduction in the light occupational base caused by postural and manipulative limitations precludes use of the grids in this case. The Commissioner argued that only the conclusive use of the grids is precluded in such a case, but that the ALJ in this case properly used the grids as a framework and concluded, based upon the VE's answers to the interrogatories, that plaintiff is able to perform work existing in significant number in the economy. The court agrees with the Commissioner.

In the grids, the Commissioner has provided a tool to aid in making uniform, efficient decisions in determining the types and numbers of jobs existing in the national economy for certain classes of claimants. *Heckler v. Campbell,* 461 U.S. 458, 468, 103 S.Ct. 1952, 76 L.Ed.2d 66 (1983). However, the grids are applicable "only when they describe a claimant's abilities and limitations accurately." *Id.* 461 U.S. at 462 n. 5, 103 S.Ct. 1952; *see also Channel v. Heckler,* 747 F.2d 577, 579 (10th Cir.1984). Because the grids are based upon the physical exertion requirements for work in the national economy, they may not be fully applicable for claimants who have nonexertional limitations. *Channel,* 747 F.2d at 580. Realizing this limitation on the use of the grids, the Commissioner has promulgated a procedure for evaluating claims where both exertional and nonexertional limitations are present:

> (2) [W]here an individual has an impairment or combination of impairments resulting in both strength limitations and nonexertional limitations, the rules in this subpart are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone and, if not, the rule(s) reflecting the individual's maximum residual strength capabilities, age, education, and work experience provide a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.

20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e)(2); *see also Channel,* 747 F.2d at 580–81.

The grids direct a finding in a particular case only when there is an "exact fit" between the criteria of the grid and the situation before the ALJ. *Campbell,* 461 U.S. at 468, 103 S.Ct. 1952; *Channel,* 747 F.2d at 579. Where the grid rules do not direct a finding, "full consideration must be given to all of the relevant facts in the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations which will provide insight into the adjudicative weight to be accorded each factor." 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 200.00(e)(2); *see also Channel,* 747 F.2d at 579–82 (application of the grids where nonexertional limitations are present).

Where plaintiff is unable to do a full range of work in an exertional category, the ALJ may not conclusively apply the grids. *Channel*, 747 F.2d at 582 (error to apply the grids absent a finding that plaintiff could perform the full range of sedentary work). Instead, he "must give 'full consideration' to 'all the relevant facts,' App. 2, § 200.00(e)(2), including expert vocational testimony if necessary, in determining whether [plaintiff] is or is not disabled." *Channel*, 747 F.2d at 583. Where nonexertional limitations affect the range of work of which plaintiff is capable, the grids may serve only as a framework to assist in determining whether sufficient jobs exist in the national economy given plaintiff's limitations and characteristics. *Gossett v. Bowen*, 862 F.2d at 806.

The cases cited by plaintiff do not compel a different result. In *Frey*, the court stated the principle, "When an individual suffers from both exertional and nonexertional impairments, the [Commissioner's] regulations mandate that the grids be applied first, to determine whether the claimant is disabled by reason of the exertional impairments alone." *Frey*, 816 F.2d at 513. The court concluded: "If the claimant is not so disabled, the ALJ must then make a second individualized determination using the grids only as 'a framework for consideration of how much the individual's work capability is further diminished in terms of any types of jobs that would be contraindicated by the nonexertional limitations.'" *Id.* (quoting 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e)(2); and citing *Teter v. Heckler*, 775 F.2d 1104, 1105 (10th Cir.1985)). While the *Espinosa* opinion uses expansive language which might suggest use of the grids is completely foreclosed except where there is an exact match between the grid criteria and plaintiff's RFC, that opinion is not binding on this court, and was decided prior to all of the Supreme Court and Tenth Circuit

precedent cited above, including *Campbell, Channel* and *Frey* which are binding upon this court. Moreover, in *Espinosa* the court noted that no vocational expert testimony was used to meet the Commissioner's burden to establish that there is work available in the economy of which plaintiff was capable. Here, as distinguished from *Espinosa*, there is VE testimony to the effect that plaintiff's RFC would only exclude about five to ten percent of the light occupational base.

■ As the Commissioner pointed out in his brief, the ALJ stated that in a case such as this when plaintiff cannot perform all of the exertional demands of work at a given level of exertion, the grids "are used as a framework for the decision." (R. 53). The ALJ then explained that if plaintiff was able to perform the full range of light work, Rule 202.13 would direct a finding of "not disabled." (R. 53). He noted that plaintiff has nonexertional limitations reducing the range of light work of which she is capable, that in accordance with the VE's answers approximately ninety to ninety-five percent of the light occupational base is available for an individual with plaintiff's RFC, and that the VE explained that light jobs such as ticket seller and photographic machine operator are within plaintiff's RFC. (R. 53–54). Finally, the ALJ concluded, "Based on the testimony of the vocational expert, the undersigned has concluded that considering the claimant's age, educational background, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to work that exists in significant numbers in the national economy." (R. 54). The decision reveals that the ALJ did not apply the grids conclusively, but properly used grid Rule 202.13 as a framework for decision and concluded that there are a significant number of jobs available of which plaintiff is capable. The

court finds no error in the ALJ's use of the grids at step five of the sequential evaluation process.

**IT IS THEREFORE RECOMMENDED** that JUDGMENT be entered in accordance with the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the Commissioner's decision.

Copies of this recommendation and report shall be delivered to counsel of record for the parties. Pursuant to 28 U.S.C. § 636(b)(1), Fed.R.Civ.P. 72(b), and D. Kan. Rule 72.1.4, the parties may serve and file written objections to this recommendation within ten days after being served with a copy. Failure to timely file objections with the court will be deemed a waiver of appellate review. *Hill v. Smith-Kline Beecham Corp.*, 393 F.3d 1111, 1114 (10th Cir.2004).

December 21, 2007.